**CORK PLUMBING COMPANY, INC.,**
Plaintiff-Respondent,

v.

**MARTIN BLOOM ASSOCIATES, INC.,**
et al., Defendants-Appellants.

No. 38968.

Missouri Court of Appeals,
St. Louis District,
Division Two.

Oct. 3, 1978.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 17, 1978.

948

Theodore F. Schwartz, Michael C. Rose, Clayton, for defendants-appellants.

Joseph P. Conran, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, for plaintiff-respondent.

REINHARD, Judge.

This appeal arises from an action instituted by respondent Cork Plumbing Company, Inc. (hereafter referred to as Cork), which sought a judgment for the imposition of a mechanic's lien upon certain real property located in St. Louis County, Missouri. Appellant, Martin Bloom Associates, Inc. (hereafter referred to as M.B.A.), was the owner of the improved real property and sought damages for breach of contract in a counterclaim. The trial court ordered a mechanic's lien against the real property, in the form of special execution to be levied only against that property, and held against M.B.A. on its counterclaim.

Respondent has made a motion to dismiss this appeal for failure to make a "fair and concise" statement of facts as required by Rule 84.04(c). We deny respondent's motion.

In October 1972, M.B.A. entered into a joint venture with Grand Glaize Village Co. for the construction of the Grand Glaize Apartments in St. Louis County. This joint venture was known as Grand Glaize Apartments Co., with each company holding a 50% interest. Grand Glaize Village Co. was to provide land for the project, and M.B.A. was to provide for the construction of the buildings. In October or November of 1973, Grand Glaize Village Co. encountered financial difficulties; consequently, the project was sold to a limited partnership, of which M.B.A. was one of two general partners. Appellant Security Properties '73 was the second general partner. M.B.A. was involved in this project as owners to this extent until February or March of 1976, at which time M.B.A. sold its interest and ceased being a general partner. Appellants Gershman Investment Corporation, Solon Gershman and Oritani Savings and Loan Association were involved here originally as holders of the Deed of Trust for the subject real property. However, this Deed of Trust has been satisfied and released of record. Consequently, these appellants hold no present interest in the real property.

On August 29, 1972, Cork submitted a proposal to M.B.A. for the materials and labor necessary for the completion of plumbing and sewer work in 176 apartment units in the Grand Glaize apartment complex. The proposal was accepted thereafter, subject to final commitment by the Federal Housing Administration. In November of 1972, the commitment was received. On February 12, 1973, M.B.A. sent Cork a second contract which covered the same work as the August 29, 1972 contract and requested that it be signed. Cork signed this contract and returned it to M.B.A. Thereafter, on May 22, 1973, Cork sent M.B.A. a letter informing M.B.A. that the prices quoted in the August 29, 1972 contract would be honored for only one year, and that a 6½% increase should be anticipated at the end of that period. On June 26, 1973, M.B.A. authorized Cork to begin work as per the August 29, 1972 contract and agreed to pay the increase starting in August, 1973. Shortly thereafter, on June 28, 1973, Cork began its work.

On April 10, 1974, Cork submitted an additional proposal to M.B.A. for plumbing work to be done on a "clubhouse" in the Grand Glaize apartment complex. Thereafter on May 22, 1974, the proposal was accepted less the cost for labor and materials for certain minor items which were excluded from the original proposal. In addition to these written agreements there were also several minor oral agreements between Cork and M.B.A. for extra work which arose during this period.

The payment terms of the two contracts at issue here are different. The August 29,

1972 agreement called for payments "to be billed as the job progresses." The February 12, 1973 contract, however, called for monthly progress payments due on or about the 20th day of each month for 90% of all labor performed, and for all the materials incorporated in the work or suitably stored at the jobsite during the preceding month. Cork billed M.B.A. monthly for the work completed. Billings were made and payments were received until May of 1974, when M.B.A. failed to pay for its May invoices. In the latter part of June 1974, the president of Cork, Willard Swyers, contacted M.B.A. in regard to the late payment. M.B.A. made assurances to Swyers that they did not have the money to make payment, but that they would have the money to do so in the near future.

An additional period of time passed in which Cork did not receive payment. At this time, Don Cork, another Cork officer, contacted Frank Malone, M.B.A.'s executive vice-president, and informed him that if payments were not received, Cork would be forced to pull off the job site. Malone indicated that M.B.A. could not pay the May, June or July invoices. Consequently, because of this failure to make current payments and M.B.A.'s statements that it would not make payments in the future, Cork pulled its men off the job on July 17, 1974. Subsequent to the removal of his men from the job, Mr. Cork and his foreman, Fred Richter, at the request of M.B.A., came back to make an adjustment on some completed ground work so that a particular building could pass inspection. This occurred on July 24, 1974, and was the last work performed by Cork for M.B.A. Cork alleged the balance due was $39,830.90.

Thereafter, in a letter dated July 30, 1974, M.B.A. proposed a different payment plan. This plan would have called for an immediate payment of $6,600 with weekly payments of $1,200 for two weeks to cover the required payroll for the project. Thereafter, upon receipt of the latest FHA-approved draw, M.B.A. would promptly pay Cork an additional $7,000. One-half the balance due would then be deferred until the final FHA-approved draw, and the rest of the balance due would be paid in monthly installments. Cork refused this plan. Subsequently, M.B.A. contracted the uncompleted work out to other plumbing contractors. M.B.A. in its counterclaim, claims the excess costs of $58,009.27 caused by the refusal of Cork to complete the work in accordance with the contracts.

On September 5, 1974, Cork filed a mechanic's lien statement in the office of the Clerk of the Circuit Court of St. Louis County in the amount of $39,830.90, pursuant to § 429.010 et seq., RSMo. 1969. Thereafter, on October 4, 1974, Cork filed suit in the Circuit Court of St. Louis County to enforce its mechanic's lien.

On June 30, 1975, M.B.A. filed a petition for arrangement under Chapter XI in the United States District Court of the Eastern District of Missouri. Subsequently, on November 25, 1975, Cork and M.B.A. entered into an agreement whereby any allowances given Cork in the Chapter XI proceeding would be without prejudice to the rights of Cork or M.B.A. and would not be deemed res judicata in the mechanic's lien litigation. Further, pursuant to Rule 11–44(d) of the Bankruptcy Act, Cork prayed for relief from the stay that had been issued by the Bankruptcy Court so that Cork could proceed in the mechanic's lien suit. Such relief was granted on October 17, 1975, by order of the Bankruptcy Court in which Cork was allowed to enforce its lien. However, Cork was limited to seeking a finding of indebtedness against M.B.A. and obtaining satisfaction through execution upon the subject improved real property, rather than enforcing a money judgment against M.B.A. On December 15, 1975, M.B.A. was discharged in bankruptcy. Cork received an allowance of $6,329.63.

After a trial in the circuit court without a jury, a judgment was entered in favor of Cork in the amount of $38,522.90. This

amount represented the value of labor and materials supplied by Cork to M.B.A. which were incorporated into the real property, plus interest, the total of which was reduced by the amount which Cork received in the Chapter XI proceeding ($6,329.63). In accord with the Bankruptcy Court order, the trial court's judgment was limited to satisfaction through execution upon the subject real property. A personal money judgment was not given.

■ Appellants first contend that the trial court erred in imposing a mechanic's lien because the Cork account had been merged and extinguished by the allowance given in M.B.A.'s Chapter XI proceedings.

Appellants rely on *Wycoff v. Epworth Hotel Construction & Real Estate Co.*, 146 Mo.App. 554, 125 S.W. 550 (1910). In *Wycoff* the plaintiff performed certain work on the construction of a project. Before the lien time had expired defendant made a voluntary assignment for the benefit of creditors under the Missouri statute.[1] In the assignment proceedings Wycoff presented his demand to the assignee and was given judgment. Subsequent thereto, Wycoff filed a suit to enforce same in the Circuit Court of St. Louis County. The trial court held against Wycoff and was sustained on appeal. This court held:

> "Our statute concerning mechanics' liens . . . contemplates that proceedings to enforce such liens *shall be founded on the account as to materials or labor furnished* . . . . In view of these provisions it has been frequently ruled by the courts of this state that, where the plaintiff has merged his lien account in a judgment, given either by a court of law or an assignee for the benefit of creditors *of the original owner or contractor,* he is thereby precluded from thereafter employing the same as a basis for the purpose of enforcing a mechanic's lien. *Although the indebtedness may continue to exist* by virtue of the judgment which is

unpaid, the account, which in contemplation of the lien statutes must be the basis of all proceedings . . . is extinguished by being merged in the judgment.

\* \* \* \* \* \*

> Under these authorities the plaintiff, by voluntarily presenting his demand and obtaining its allowance before the assignee, precluded and forfeited his right to thereafter enforce a lien in a suit on the account, . . . ." *Wycoff, supra,* 125 S.W. at 551–552. (Emphasis added.)

Although *Wycoff* did not involve the allowance of a claim in bankruptcy, it has been held that an arrangement confirmed by a Bankruptcy Court has the effect of a judgment rendered by the district court. *Miller v. Meinhard-Commercial Corporation,* 462 F.2d 358 (5th Cir. 1972).

In attempting to apply *Wycoff*, appellants would have us overlook the peculiar circumstances of this case. Cork filed suit to enforce its mechanic's lien on October 4, 1974; thereafter responsive pleadings were filed by the appellants. In June, 1975, M.B.A. filed a petition for arrangement under Chapter XI of the Bankruptcy Act. On October 17, 1975, pursuant to Rule 11–44(d) of the Bankruptcy Act, the Bankruptcy Court made the following order:

> "It is ordered that authority be, and is hereby granted, that all lien claimants be allowed to proceed in the suit as aforedescribed in order that all such claimants may enforce their mechanic's liens against the property described in the petition; provided, however, that such lien claimants be, and they are hereby limited, to seeking a finding of indebtedness as to the debtor herein, and they are hereby restrained and enjoined from enforcing as against the debtor any monetary judgment or decree they may obtain in said proceeding other than by the filing of the claim against the debtor's estate herein . . . ."

1. This is now § 426.010 et seq., RSMo. 1969.

The record further shows that an agreement was entered into on November 25, 1975, between Cork and M.B.A., whereby it was agreed that Cork's claim of $42,164.23 would be allowed "without prejudice to the rights of Cork or MBA. . . ." in the mechanic's lien suit and that the allowance of the claim would not be deemed as res judicata.[2]

The parties stipulated that, pursuant to an order of the Bankruptcy Court, Cork had received payment from M.B.A. in the sum of $6,329.63.

Cork's suit to enforce its mechanic's lien in the state court was filed prior to M.B.A.'s petition for arrangement under Chapter XI of the Bankruptcy Act. Rule 11–44(a) provides that a filing of a petition for an arrangement under Chapter XI automatically stays all actions to enforce a lien against the debtor's property. Rule 11–44(d) provides, however, that the Bankruptcy Court may, upon the filing of a complaint and a showing of cause, terminate, annul modify or condition such a stay, as was done here. Both the terms of the Bankruptcy Court's order, expressly providing that lien claimants be allowed to proceed in enforcement of their mechanic's liens, and the arrangement between Cork and M.B.A., stipulating that the arrangement would not prejudice the rights of Cork or M.B.A. in the mechanic's lien suit, preclude M.B.A. from now contending that the Cork account was merged in the Chapter XI allowance given Cork.

■ Furthermore, the doctrine of res judicata is clearly inapplicable to the case. A judgment is not an adjudication as to matters which the court expressly refrains from deciding and which it directs should be litigated in another action. *Record Machine & Tool Co. v. Pageman Holding Corp.*, 172 Cal.App.2d 164, 342 P.2d 402, 408 (1959); *Cianchette v. Verrier*, 155 Me. 74, 151 A.2d 502, 510 (1959), 50 C.J.S. Judgments § 711. See also *Horton v. Queens County Machinery Corp., Inc.*, 101 Misc. 31, 166 N.Y.S. 662 (1917), affd. 182 App.Div. 932, 169 N.Y. Supp. 1097 (1918).

The parties stipulated that the action in the Bankruptcy Court would be without prejudice to and would not be deemed as res judicata in the mechanic's lien suit. The Bankruptcy Court reserved for the state court the finding of indebtedness on the balance due and specifically directed that such matters should be litigated in the mechanic's lien action. Accordingly, appellant's first point fails.

■ This holding is consistent with the purpose of Missouri's mechanic's lien statute, which is based on the principle that those who have contributed labor and material to the improvement of property are entitled to look to the property for compensation. *Putnam v. Heathman*, 367 S.W.2d 823, 828 (Mo.App.1963). Consequently, the statute gives mechanics and materialmen a protected status in regard to claims against improved property in which is corporated their toil and materials. Although a construction of the statute is not required on this point, we note that, pursuant to the equitable purposes of the statute,[3] a general policy exists in Missouri which requires the courts to uphold wherever possible the rights of laborers and materialmen to the enforcement of their claims against property into which they have put labor and materials.

---

**2.** It must be noted here that the agreement between the parties, and the Bankruptcy Court order (made pursuant to Rule 11–44(d)) are consistent with proceedings under Chapter XI of the Bankruptcy Act. Under Chapter XI, a debtor, whether insolvent in the usual bankruptcy sense or solvent but unable to pay his debts as they mature, may, while remaining in business with court approval, effect a settlement or extension of his unsecured debts. Only unsecured debts may be settled, satisfied or extended in the Chapter XI case. However, under Rule 11–44, secured creditors and lien holders are affected, as proceedings to enforce liens are automatically stayed during the pendency of the Chapter XI case.

**3.** See *Herrman v. Daffin*, 302 S.W.2d 313, 316 (Mo.App.1957); *Johnson v. Brill*, 295 S.W. 558, 562 (Mo.1927).

While Missouri courts do not appear to have ruled on this specific issue, they have long recognized this public policy.[4] In *Holland v. Cunliff*, 96 Mo.App. 67, 69 S.W. 737 (1902),[5] the court stated:

> "The fixing of a lien, however, upon the property is one of the prime objects which the statute has in view, and is not diverted from by reason either of the insolvency or of the absence of the chief debtor. If he is insolvent, the execution against him is nevertheless levied on the property charged with the lien. . . . These measures are designed to prevent a default of justice, and to make effective the statutory declaration that on certain facts the plaintiff 'shall have for his work or labor done' a lien on the real property. Rev.St. 1899, § 4203 [6]. . . . The law is to be enforced in the spirit which gave it forth." *Holland, supra,* 69 S.W. at 739.

Furthermore, it has been firmly established in Missouri that the mechanic's lien statute is to be given a highly liberalized construction so as to effectuate the beneficent purposes for which it was adopted. *Henges v. Doctors' North-Roads Building, Inc.,* 409 S.W.2d 489, 492 (Mo.App.1966).

The second issue raised is whether the form of the judgment rendered by the trial court is improper. Respondent brought suit under § 429.240, RSMo. 1969, praying for judgment against M.B.A. for a special judgment decreeing the mechanic's lien. Subsequent to Cork's obtaining personal service on M.B.A., M.B.A. filed proceedings under Chapter XI of the Federal Bankruptcy Act. Pursuant to Rule 11–44(a) of said Act, proceedings in the circuit court were stayed until such stay was terminated by the Bankruptcy Court. The conditions recited in the order of the Bankruptcy Court limited the mechanic's lien judgment to a finding of indebtedness which could only be executed against the improved property. The circuit court found that M.B.A. was indebted to Cork in the sum of $38,522.90, granted a judgment in that amount, and ordered that said judgment be declared a mechanic's lien against the buildings, erections, and improvements in real estate as described in the petition. The trial court's order complies fully with the order of the Bankruptcy Court, which was made pursuant to Rule 11–44(d).

Appellant argues that in a mechanic's lien action, where personal service is had over the debtor, no execution may be had against the subject real estate until an execution is had against the assets of the debtor, and such are found to be insufficient. Appellants cite § 429.240, RSMo 1969; and *Farley Brothers v. Cammann,* 43 Mo.App. 168 (Mo.App.1891) in support of this proposition.

In *Hill v. Chowning,* 93 Mo.App. 620, 67 S.W. 750 (1902), the court held that former § 4216 Rev.Stat.1899, which is identical to the present § 429.240,[7] was applicable only

---

4. Other jurisdictions have stated the same public policy. See *Geis Irr. Co. of Kansas, Inc. v. Satanta Feed Yards, Inc.,* 214 Kan. 373, 521 P.2d 272 (1974); *Mullins v. Noland Co.,* 406 F.Supp. 206 (N.D.Ga.1975)*; *Eberle v. Drennan,* 40 Okl. 59, 136 P. 162 (1913); *Chickasaw Hotel Co. v. C.B. Barker Const. Co.,* 135 Tenn. 305, 186 S.W. 115 (1916).

5. *Holland* involves a factual situation in which the debtor-owner was released in bankruptcy after the creditor-contractor had filed his mechanic's lien suit. The court held that this lien was not released by the discharge in bankruptcy; however, the court resolved that the lien was not discharged because a lien was not a "legal proceeding" within the meaning of the Bankruptcy Law of 1898. Such is not the case under the present Bankruptcy Act, and therefore, *Holland* would be inapplicable to the present situation. A second distinguishing factor is that in *Holland* an allowance was not given to the contractor, as was given presently. It also is not clear in *Holland* whether the contractor had even joined in the bankruptcy proceedings as a general creditor. We feel, however, that *Holland* does stand for the stated public policy.

6. The same language is found in § 429.010, RSMo. 1969.

7. § 429.240 *Judgment on personal service.*
   When the debtor has been served with summons according to law, or appears to the action without service, the judgment, if for

to the situation where the debtor and owner are not one and the same person. *Hill v. Chowning, supra*, 67 S.W. at 751. M.B.A. was one of the owners in this case and it could be argued that *Hill* is controlling. However, it is unnecessary to rely on *Hill* due to the circumstances here. The stay order limited the action of the circuit court. To rule that failure to grant a personal judgment precludes the granting of a mechanic's lien would, under these circumstances, make it possible for a debtor to escape the provisions of the mechanic's lien statute by seeking jurisdiction of the Bankruptcy Act. This would be contrary to the purposes of the mechanic's lien action and Chapter XI. Accordingly, we reject appellants' argument in this regard.

Appellants next attack the trial court's ruling that M.B.A. had defaulted on its agreement with Cork. Appellants argue that the trial court in its findings failed to give effect to the terms of the contract concerning payment, and that under the payment terms of the contract there was no material breach. The court found, "That as of July 16, 1974, the defendant, MBA, Inc. had failed to make payments as required for work which had been completed and had represented to the plaintiff that MBA, Inc. would be unable to make timely payment for the completed work, work in process and future work, and such conduct on the part of the defendant, MBA, Inc. constituted a breach of the aforesaid contract between plaintiff and the defendant, MBA, Inc." The court, however, did not indicate which contract was governing. There are three contracts involved.

First, there is the August 29, 1972 contract in which payments were "to be billed as the job progresses." Swyers testified that this phrase, according to the custom of the plumbing industry, means that a bill for a month's work would be sent out at the end of that month, with payment due within 30 days.

The second contract involved was an agreement entered into on February 12, 1973. This agreement was a regular subcontractors form contract sent out by M.B.A. for the same work covered by the August 29, 1972 contract. The payment terms of the February 12, 1973 contract provided that:

> "Monthly progress payments shall be paid by the Contractor to the Subcontractor on or about the 20th day of the month for 90 percent of all labor performed and for all materials incorporated in the work or suitably stored at the jobsite during the preceding month, and for which payment has been made by the Owner to the Contractor . . . . Payment of the full contract price, less the sum of progress payments previously made, shall be paid to the Subcontractor within thirty days after final acceptance of the project by the Owner, and upon evidence furnished by Subcontractor that all claims for labor and materials have been paid in full."

Subsequent to this second agreement, Cork sent M.B.A. a letter dated May 22, 1973, in which Cork informed M.B.A. that, due to the delay of the starting date, Cork would only honor the contract for a period of one year, and that at the end of that period a 6½% price increase would go into effect. In a letter dated June 26, 1973, M.B.A. agreed to these modifications and authorized work to begin on the project pursuant to the August 29, 1972 agreement.

The third contract involved was one entered into on May 22, 1974, for certain plumbing work in the project's "clubhouse". The payment terms under this agreement were the same as those terms contained in the February 12, 1973 agreement.

Appellants argue that because of the inconsistent payment terms in the August 29, 1972 and the February 12, 1973 contracts, covering the same work, the terms of the second contract should be given effect.

the plaintiff, shall be against such debtor as in ordinary cases, with the addition that if no sufficient property of the debtor can be found to satisfy such judgment and costs of suit, then the residue thereof be levied as provided in section 429.230.

Cork argues that they were operating under the August 29, agreement, because of M.B.A.'s June 26, 1973 letter authorizing Cork to proceed pursuant to the terms of the August 29, 1972 agreement. We agree with appellants that the payment terms of the February 12 agreement govern. First, Cork had been accepting payments for only 90% of the work completed, and had allowed M.B.A. to retain 10% of the total amount. Thus, in execution, Cork had been conforming to the payment terms of the February 12, 1973 agreement. Secondly, as testimony by Swyers reveals, Cork had agreed to operate under the payment terms of the February 12, 1973 agreement.

Nevertheless, there was substantial evidence to support the court's finding of breach under the terms of either contract.

By M.B.A.'s admission, it was $2,700.00 delinquent in its payments to Cork as of July 17, 1974, which deficiency included non-payment of May invoices. Cork's evidence indicated a debt of $39,830.90. Even assuming the proper figure to be $2,700.00, termination was justified here. Cork had been told by Frank Malone, executive vice president of M.B.A., that it could not pay June invoices and would not be able to pay for the work done in July. Malone had stated, "we don't have the money to pay everybody." Don Cork testified, "He wanted me to finish up the project and him pay my men every week and me hold the bill until the end of the project, . . . ." M.B.A.'s letter dated July 30, 1974, verified the fact that M.B.A. would be unable to comply with the payment terms of either contract.

As an initial basis of Cork's refusal to complete the work, the evidence supports the finding that M.B.A. had expressly represented to Cork that it would be unable to make payments in the future in accordance with the contract. This constituted an anticipatory repudiation on the part of M.B.A. sufficient to justify Cork's cessation of work.

■ As a general rule an anticipatory breach by repudiation occurs when one party to a contract repudiates it by manifesting an intention not to perform. When this manifestation takes place, the duty of the other party is terminated. *Ewing v. Miller*, 335 S.W.2d 154, 158 (Mo.1960); 13 Am. Jur.2d, Building and Construction Contracts, § 73. Missouri has long recognized the doctrine of anticipatory breach by repudiation. *Ewing v. Miller, supra* ; *Eddington v. Cockrell*, 286 S.W. 405 (Mo.App.1926). However, an anticipatory repudiation may be shown only by the disclosure, by express statements or otherwise, of a positive intention not to perform the contract. The statements made by M.B.A. to Cork as to its intention not to honor the payment terms of the contract satisfy this requirement. There was sufficient evidence in the record to substantiate the court's finding of an anticipatory repudiation.

■ Aside from the evidence of anticipatory repudiation, there was also substantial evidence to support the finding of a present material breach justifying Cork's action, again under either contract. The contract of August 29, 1972, provided, "In case any payment is not made when due and payable the plumber may terminate his contract and the builder agrees to pay at once for all plumbing installed." Such a clause was not in the February 12, 1973 contract. However, in the absence of such a clause, the failure to pay an installment in a construction contract can nevertheless constitute a material or substantial breach justifying termination, depending on the circumstances of each particular case. Appellants argue that M.B.A.'s failure to pay when due did not possess "sufficient gravity" to discharge Cork from its duty of performance. We disagree.

Because of the nature of construction contracts and the contractor's need for funds to meet expenses and proceed with construction, courts have distinguished construction contracts from other installment contracts with respect to the subcontractor's right to terminate for non-payment of installments. This judicial sentiment is ex-

pressed in *Brady Brick & Supply Co. v. Lotito*, 43 Ill.App.3d 69, 1 Ill.Dec. 844, 848, 356 N.E.2d 1126, 1130 (1976):

"Building and construction contracts frequently provide for partial payments to be made to the contractor as the work progresses, either periodically or upon completion of specified stages of the work and like any other contract may be rescinded for default in performance. The failure to pay an installment of the contract price as provided in a building or construction contract is a substantial breach of the contract and gives the contractor the right to consider the contract at an end, to a cease work, and to recover the value of the work already performed." *Brady Brick & Supply Co., supra*, 43 Ill.App.3d at 1130, 1 Ill.Dec. at 848, 356 N.E.2d at 1130.

See also 13 Am.Jur.2d, Building and Construction Contracts, § 102; *Bean v. Miller*, 69 Mo. 384 (Mo.1879).[8]

We recognize that the facts in every construction contract might not warrant a termination upon failure to pay an installment, but the present facts, particularly the repeated failure to keep payments current coupled with M.B.A.'s statements about future payments, permit such a resolution. We must consider the effect of delays on the builder's finances, and "[s]ince the builder's risks depend largely upon the financial resources of the debtor, . . . a non-payment by an obligor who is of doubtful solvency . . . *or who accompanies his non-payment by words of near-repudiation is almost certain to be held a vital breach.*"[9] (Emphasis added.) 3A Corbin on Contracts, § 692. The evidence supported the propriety of the termination by Cork based upon a present material breach.

Appellants raise several additional arguments challenging the trial court's finding of material breach, however, none of these is persuasive.

Appellants argue that M.B.A. did not breach the contract because payment by the owner to the general contractor is a condition precedent to the duty of payment by the general contractor to the subcontractor. Here, appellants argue that M.B.A. was the general contractor, and not the owner, and therefore, M.B.A. had no duty to pay Cork until it had received payment from the owner. Bloom, president and major stockholder of M.B.A. testified that M.B.A. had an ownership interest in the project from its inception in 1972, when M.B.A. had a 50% interest in the project with Grand Glaize Village Co., until M.B.A. sold its interests in the project in March of 1976. M.B.A. was both owner and general contractor. Due to this uncontroverted testimony, we can only reject appellants' argument.

Appellants next argue that there was no breach on the part of M.B.A. because the amount which was found to be owed to Cork included certain "extras" which were unauthorized. An "extra" is certain additional piece work which arises occasionally during construction, which is done pursuant to oral requests by the owner or contractor, and which is not covered by a written contract.

According to our standard of review as set forth in *Murphy v. Carron*, 536 S.W.2d 30 (Mo.1976), there appears substantial evidence to support the trial court's finding that the "extras" were authorized. Testimony of Donald Cork, Willard Swyers, and Cork foremen Clarence Curtis and Fred Richter demonstrated that M.B.A. had, on numerous occasions, requested this additional work and had authorized the work as "extras" to the contract. In addition, invoices for the "extras" were billed to M.B.A. and were paid by M.B.A. with no protest ever being lodged. Accordingly this argument fails.

---

8. The failure of M.B.A. to pay was in no way based on default in work on the part of Cork.

9. We cite Corbin for the principles expressed rather than for exact correlation to our facts.

The reference to "words of near-repudiation" is not to be interpreted as contradicting our finding that M.B.A. had anticipatorily repudiated the contract.

The final argument raised under this point is that M.B.A. could not have breached the contract because, under § 400.2–609, RSMo 1969, adequate assurances were given to Cork that payment would be made, and because of such assurances Cork had no right to repudiate the contract. Section 400.2–609 provides a remedy for a party to a contract for the sale of goods when that party has reasonable grounds to suspect that the other party will not perform. In such a situation that party, having reasonable grounds for insecurity in the performance by the other party, may make a written demand for adequate assurances. After receipt of such a justified written demand, adequate assurances must be given within 30 days.

Section 400.2–102, RSMo 1969 limits the applicability of § 400.2–609 to "transaction in goods". Therefore, the initial question to be resolved here is whether a plumbing construction contract, which includes both labor and materials, is a "transaction in goods". We hold that such a contract is not such a transaction, and hence, § 400.2–609 is inapplicable.

This question, although it appears to be one of first impression in Missouri, has been resolved in many other jurisdictions. The test which has been generally applied in such a situation is, granting that goods and services are mixed into the contract, whether their predominant purpose is the rendition of service, with goods incidentally involved, or is a transaction of sale, with labor incidentally involved. *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974); *Lincoln Pulp & Paper Co., Inc. v. Dravo Corp.*, 436 F.Supp. 262, 275 (N.D.Me.1977); *Mingledorff's, Inc. v. Hicks*, 133 Ga.App. 27, 209 S.E.2d 661, 662 (Ga.App.1974); *DeMatteo v. White*, 233 Pa.Super. 339, 336 A.2d 355, 358 (1975).

Applying this test presently, we view the contract at bar as one for the construction of a plumbing system, rather than one for the sale of goods as recognized by the Uniform Commercial Code. Cork took specific materials and apparatus, manufactured by various dealers, and assembled and connected them into a completed plumbing system. In the construction of such a system, the labor predominates, with the materials being merely an incident thereto. We hold that § 400.2–609 is inapplicable. Due to this ruling, we need not resolve whether the assurances given to Cork, in the form of a modified payment plan, were in fact adequate. Accordingly we reject appellants' arguments.

We have determined that M.B.A. breached its contract with Cork, and that Cork was justified in terminating. Accordingly, we need not consider any further issues raised by appellants concerning their counterclaim.

Appellants next contend that the court erred in awarding a judgment imposing a mechanic's lien upon the real estate because the account was not a "just and true account" as required by § 429.080, RSMo 1969. The contention is made that since the account did not comply with the statute, Cork is not entitled to a mechanic's lien.

Appellants did not raise this contention during the trial or in their motion for a new trial. They did not object to the admission of the lien statement; in fact, the appellants stipulated "that all the work, labor and materials, that they have set out in their lien claim actually went into the construction of the project known as the Grand Glaize Apartments . . . ." They further stipulated "that the prices charged for the items and material that went into the buildings were all reasonable and that the prices were the accurate prices at the time reflected in the lien itself, and in addition to that, all the items put into the building and all the material and labor were done in a good workmanlike manner with one exception . . . ." As to Cork's mechanic's lien claim the stipulation was that the "only dispute is whether all the extra items on the bill of invoices were, in fact extra items or were to be included in the original con-

tract." Cork's lien statement included a 14 page description of all work performed and materials provided.

The legislative purpose of requiring the filing of a "just and true account" is so that the land owners and others interested may learn from the lien statement what the lien claimant asserts he has furnished, thus permitting an investigation to be made to determine whether the materials actually went into the building, whether they were lienable items, and whether the amount charged is proper. *Wadsworth Homes, Inc. v. Woodridge Corporation,* 358 S.W.2d 288, 291 (Mo.App. 1962); *J. R. Meade Company v. Forward Construction Co.,* 526 S.W.2d 21, 27 (Mo. App.1975). The lien statement in this case satisfied this legislative purpose, and accordingly we reject this point.

The appellants finally claim that the court erred in its inclusion of interest and in its award of costs against M.B.A., Inc. M.B.A. argues that the state court should not have included interest in the judgment, because the subject matter of the action involved a bankruptcy which is a matter within the jurisdiction of the federal courts.

The trial court, in a mechanic's lien action, may render judgment for the amount claimed in the demand, together with interests and costs. Section 429.210, RSMo 1969; *Mid-West Engineering & Const. Co. v. Campagna,* 421 S.W.2d 229, 232 (Mo.1967). The debt involved in this case continued, although execution would be limited to the imposition of a mechanic's lien. The interest granted is considered an integral part of this continuing debt. *Bruning v. United States,* 376 U.S. 358, 360, 84 S.Ct. 906, 908,

11 L.Ed.2d 772 (1964). Furthermore, this is not a situation where the interest is being imposed upon the bankrupt's estate, resulting in unfairness as between competing creditors. *Id.* at 362, 84 S.Ct. 906. The interest is being awarded only as part of the mechanic's lien. We find that the circuit court computed the interest in the manner approved in *Mid-West Engineering & Const. Co.* and that the allowance of interest was not contrary to the order of the Bankruptcy Court, wherein the Court restricted Cork to "seeking or finding of indebtedness as to the debtor herein . . . ."

As to the imposition of court costs, the circuit court did not declare the costs to be a lien on the property, although the statute provides that it could do so. Rather the court exercised its discretion in assessing the costs against M.B.A. personally, which was clearly proper under the circumstances. Cork and M.B.A. had stipulated that the mechanic's lien action would be pursued in the state court and had provided for the counterclaim by M.B.A. This arrangement was approved by the Bankruptcy Court, and pursuant to that arrangement M.B.A. filed a counterclaim. M.B.A.'s petition represented more than simply a defense to the mechanic's lien action but rather constituted an affirmative claim against Cork. M.B.A. was pursuing its own cause of action against Cork. The assessment of the court costs against M.B.A. alone was therefore proper in this case and not inconsistent with either Missouri law or the Bankruptcy Court.

The judgment of the trial court is affirmed.

STEWART, P. J., and STEPHAN, J., concur.