**ART METAL PRODUCTS COMPANY OF CHICAGO, Respondent,**

v.

**ROYAL EQUIPMENT CO., Appellant,**

v.

**J.E. DUNN, JR. AND ASSOCIATES, Third-Party Defendant.**

**No. WD 34710.**

Missouri Court of Appeals, Western District.

April 24, 1984.

Steven P. Denton and Eugene F. DeShazo of Denton & DeShazo, Kansas City, for Royal Equipment Co.

Keithley F.T. Lake, Kansas City, for Art Metal Pdts. Co.

Jeffrey B. Rosen of Miller & Glynn, P.C., Kansas City, for J.E. Dunn, Jr. and Associates, Inc.

Before PRITCHARD, P.J., and MANFORD and NUGENT, JJ.

MANFORD, Judge.

This is a civil action on account tried to the court without a jury. The judgment is affirmed as modified.

A sole point is presented, charging that the trial court erred in entering its judgment, because the judgment was against the weight of the evidence in that the same acts, which in the two contracts involved were performed by appellant, constituted either performance or breach in both contracts so that ultimate liability could not, as a matter of law, rest with appellant.

This cause, having been tried to the court, places the review of same within Rule 73.01 as that rule has been interpret-

ed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976). The following is a summary of the pertinent facts.

J.E. Dunn, Jr. and Associates (respondent-third party defendant and hereinafter referred to as Dunn) contracted with the Park Hill School District in Kansas City, Missouri for construction work at Park Hill Senior High School. The project was to be completed on November 1, 1979. As part of that project, Dunn entered into a subcontract with Royal Equipment Company, Inc. (original defendant-third party plaintiff-appellant and hereinafter referred to as Royal) wherein Royal was to provide student athletic lockers. By its terms, the subcontract subjected Royal to the terms of the general contract between Dunn and the school district, inclusive of architect approval, plans, and specifications. The subcontract between Dunn and Royal was executed on May 31, 1978. Royal was required to submit "shop drawings" of the lockers, as they were custom made and not a standard locker item. Royal submitted five separate "shop drawings" over a thirteen-month period, and all were rejected by the architect except the fifth. In turn, Royal contracted with Art Metal Products Company (original plaintiff-respondent and hereinafter referred to as Art Metal) for the manufacture of the lockers according to the specifications for them. The lockers, when completed by Art Metal, were to be shipped to the school where Royal was to install them.

The specifications for the lockers provided that the lockers were to have perforated bottoms, fronts, and sides as to provide ventilation for sports clothing and equipment. When the lockers arrived, they had solid bottoms. Arrival of the lockers did not occur until December 27, 1979, almost two months after the project completion date prescribed in the prime contract. On December 31, 1979, the architect rejected the lockers because they did not have perforated bottoms.

Dunn notified Royal, and on January 2, 1980, a meeting at the project site was held, which included representatives of the architect, Dunn, and Royal. At this meeting, the architect told Royal that the solid bottoms must be removed and perforated bottoms installed. Royal failed to notify Art Metal of the architect's directive, although Royal had the obligation to communicate with Art Metal.

On January 3, 1980, Dunn by letter confirmed the removal of the solid bottoms with Royal, indicated Dunn's awareness of Royal's delay, and advised Royal that unless the lockers were corrected, Dunn would contract with a local firm to do it. On January 5, 1980, Dunn again in writing demanded Royal to correct the lockers according to the architect's specification.

As an alternative, Royal cut a three-inch hole in the locker bottoms and ordered from Art Metal four-inch by four inch plates with a center perforation to be laid over the three-inch hole. These "infill plates" were delivered to Royal by Art Metal on January 31, 1980. The so-called modification by Royal was completed on about February 20, 1980. On March 10, 1980, the architect viewed Royal's modification, rejected it, and advised Dunn that fully perforated bottoms were wanted and that the partial infill plates were not acceptable. Dunn in turn notified Royal. Royal in turn never advised Art Metal.

Again, on March 17, 1980, Dunn advised Royal that the modification was not acceptable to the architect, demanded that the matter be corrected, and if not done, Dunn would contract a local company to complete the job. This notice also advised Royal of potential backcharges for Royal's failure to complete the work. This notice was not forwarded to Art Metal by Royal. A like communication was again sent by Dunn to Royal on April 15, 1980, and Royal in turn did not advise Art Metal.

By June 11, 1980, Royal had still failed to replace the locker bottoms, and at that time the architect directed Dunn to conduct an air-flow test for locker ventilation. This test was conducted by the heating installation company for the project, the Air Cooling Company. On July 7, 1980, the architect in writing advised Dunn that the par-

tial plates installed by Royal did not comply with the plans and specifications for the lockers. The architect also advised that the infill plates would cause problems with the locker ventilation system and that fully perforated locker bottoms had to be installed. The architect also directed Dunn to advise if the correction could not be made by August 1, 1980, as the school year was about to commence. The architect also advised Dunn that if the correction could not be made by August 1, 1980, Dunn should hire another company to complete the work. On July 10, 1980, Dunn forwarded the architect's letter to Royal. In addition, Dunn advised Royal to notify Dunn if Royal could not meet the August 1, 1980 date. Dunn further stated that if Royal could not complete the work by August 1, 1980, Dunn would hire a local firm to perform it. This notice from Dunn was not forwarded to Art Metal by Royal.

A witness for Art Metal testified that the first time Art Metal was advised by Royal that the architect wanted perforated bottoms was on July 17, 1980. On July 22, 1980, Dunn in writing again contacted Royal, asking for written verification of the work completion by August 1, 1980. Art Metal was never advised of this communication. On July 29, 1980, Art Metal forwarded two (sample) perforated bottoms to Royal for acceptance. The samples were forwarded for approval prior to the manufacture of the remaining 180 required to complete the job. Royal never advised Dunn about the sample plates and in turn never advised Dunn that the work would be completed by August 1, 1980.

On July 31, 1980, Dunn wrote to Royal, advising the latter that Dunn had no alternative but to hire a local firm to complete the job and that Dunn could backcharge Royal for the completion costs. Under the terms of the subcontract, Dunn with Royal exercised its right to cancel and in turn hired the H. Zahner Sheet Metal Company to complete the work on the lockers. Completion was achieved on about August 22, 1980 for a total cost of $6,075.00. This same sum was backcharged to Royal by Dunn. Since it was backcharged, Royal did not pay the remaining sum claimed due by Art Metal. Art Metal sued Royal on account for $6,075.00. Royal in turn filed a third-party petition against Dunn, charging breach of the subcontract. The case was tried to the court, which entered judgment for Art Metal and against Royal in the sum of $6,075.00, and in turn found for Dunn and against Royal on Royal's third-party claim. This appeal followed.

Under its sole point, Royal charges that the trial court erred in entering judgment for Art Metal on its claim and for Dunn on Royal's claim against Dunn, because that judgment was against the weight of the evidence in that the same acts, which in both contracts were performed by Art Metal, constituted either performance or breach in both contracts, "so that ultimate liability could not as a matter of law rest" with Royal.

Royal argues that this case comes within § 400.2–102, § 400.2–508, and § 400.2–602 of the Uniform Commercial Code. Royal includes § 400.2–102 to emphasize its contention that the supply of the lockers herein by Royal was a sale or transaction in goods and thus within the Code. In addition, Royal relies upon § 400.2–508 for its contention that the buyer (Dunn) was required to afford Royal as the seller a reasonable opportunity to cure any claimed defect relative to the lockers. In addition, Royal cites to § 2.400–602 to support its contention that Dunn had accepted the goods (the lockers) since there was, by the evidence, a showing that the lockers were not rejected within a reasonable time after delivery.

From the above, Royal suggests to this court the issue to be resolved is whether the lockers, as modified, constituted substantial performance by Royal and Art Metal. Royal contends that if the lockers did constitute substantial performance, then Dunn and the architect should have accepted them, and the failure to pay the contract price for the lockers was a breach of contract. Alternatively, Royal argues that if the lockers did not constitute sub-

stantial performance by Royal and Art Metal, then the issues to be resolved include whether Dunn rejected the lockers within a reasonable time and/or if Dunn did not reject them within a reasonable time, then as a matter of law Dunn accepted the lockers and a failure to pay the contract price was a breach of contract.

From the above premise Royal argues that 20 days (July 10–August 1, 1980) was not a reasonable time to permit Royal to correct the defect (installation of perforated locker bottoms) when Dunn had waited over four months to reject the lockers. The four-month period claimed by Royal was from February, 1980 through June, 1980, during which Royal contends that Dunn could and should have air-tested the locker system for ventilation. Royal concludes that if the time was unreasonable, then Dunn, by rejection and having the work completed by another, prevented performance by Royal and Art Metal, and that refusal to pay by Dunn was a breach of the contract.

As a concluding argument, Royal charges that if there was no substantial performance and Dunn reasonably rejected the lockers and afforded Royal a reasonable time to correct the defect, then Royal, in its contract with Art Metal, also rejected and afforded Art Metal a reasonable opportunity to correct the defect; thus the charge back from Dunn to Royal which Royal in turn charged back to Art Metal was proper and hence a defense to the claim of Art Metal as against Royal.

Royal further contends that in any event, the evidence clearly shows that the charge back to Art Metal was but $5,325.00 and not $6,075.00, because the lesser amount was the amount claimed by Art Metal as against Royal.

In the first place, this court concludes that the subcontract between Dunn and Royal is not within the Uniform Commercial Code as contended by Royal. The evidence herein shows that the basis and purpose of the subcontract was for Royal to supply custom built athletic lockers in accordance with the plans and specifications of the project architect, and for Royal to supply the requisite skilled labor to install the locker system. Royal, under the facts and circumstances herein, was not simply a provider or seller of goods (the lockers), but more importantly and more distinctly, Royal's role was that of the installer of the custom lockers.

Royal urges this court to adopt the rule announced in *Anderson Construction Co., Inc. v. Lyon Metal Products, Inc.*, 370 So.2d 935 (Miss.1979). *Anderson* is a decision from our sister state of Mississippi which dealt with the applicability of the Mississippi statute of frauds as applicable to a contract for the sale and distribution of lockers to be installed in a local high school. *Anderson* is to be and must be distinguished, and hence is neither applicable nor controlling herein because of various reasons.

In the first instance, there is nothing in *Anderson* which denotes that the lockers under consideration were of custom design. There is nothing in *Anderson* which suggests that the project for the high school in Mississippi provided for anything but a standard type locker. In reading *Anderson*, one must conclude that the providing of the lockers (i.e., goods) was the major and controlling factor as opposed to the instant case where Royal entered into a subcontract with Dunn for the express purpose of installing specially designed lockers. The evidence reveals that Royal did not sell such special lockers and in turn contracted with Art Metal for their production. This court need not look to *Anderson* or any other case from some foreign jurisdiction, because this question has been ruled previously by our own courts in the case of *Cork Plumbing Co., Inc., v. Martin Bloom Associates, Inc.*, 573 S.W.2d 947, 958 (Mo.App.1978). In *Cork*, recovery was based upon a claim for a mechanic's lien and the defense to such claim was a breach of contract. An issue was drawn over whether a construction contract calling for both labor and materials was within the Uniform Commercial Code, specifically

§ 400.2–102 and 400.2–609. The court in *Cork* ruled:

"Section 400.2–102, RSMo 1969 limits the applicability of § 400.2–609 to 'transaction in goods'. Therefore, the initial question to be resolved here is whether a plumbing construction contract, which includes both labor and materials, is a 'transaction in goods'. We hold that such a contract is not such a transaction, and hence, § 400.2–609 is inapplicable.

This question, although it appears to be one of first impression in Missouri, has been resolved in many other jurisdictions. The test which has been generally applied in such a situation is, granting that goods and services are mixed into the contract, whether their predominant purpose is the rendition of service, with goods incidentally involved, or is a transaction of sale, with labor incidentally involved. *Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974); *Lincoln Pulp & Paper Co., Inc. v. Dravo Corp.,* 436 F.Supp. 262, 275 (N.D.Me.1977); *Mingledorff's, Inc. v. Hicks,* 133 Ga.App. 27, 209 S.E.2d 661, 662 (Ga.App.1974); *DeMatteo v. White,* 233 Pa.Super. 339, 336 A.2d 355, 358 (1975)."

When the *Cork* rule is applied herein, the conclusion must be that the Royal-Dunn subcontract was not within the provisions of the Uniform Commercial Code and it is so ruled.

What the evidence reveals is Royals' continued default upon its subcontract with Dunn. The evidence further reveals that Royal's performance was subject to the plans and specifications and approval of the project architect. The subcontract provided that it was subject to and a part of the prime contract between Dunn and the school district. The subcontract allowed Dunn to terminate the subcontract upon Royal's failure to perform and to secure completion of the contract from other sources upon Royal's default. The evidence reveals that Royal had ample notice and opportunity to correct the locker bottoms in accordance with the requirements prescribed by the architect, and further that Royal failed to do so.

The charge back by Dunn to Royal was in all regards a proper remedy available to Dunn as against Royal under the terms of the subcontract.

There is absolutely no evidence to support Royal's contention that it in turn reasonably rejected the lockers and further, afforded Art Metal a reasonable opportunity to correct the matter. The evidence reveals that Royal did nothing to advise Art Metal of the rejection by the architect and Dunn. In fact, Art Metal did not learn of the rejection until July 17, 1980. The evidence reveals that Art Metal learned of the Dunn-architect rejection by direct contact with the architect and not through Royal.

As the evidence reveals, Art Metal was at all times ready to perform under its contract with Royal. The evidence further reveals that Art Metal incurred expenses in preparation of its performance. Art Metal was entitled to recovery from Royal under its contract under a claim for accounting.

Royal further contends that if Art Metal is allowed to recover, the amount is limited to the sum of $5,325.00 as opposed to the sum of $6,075.00, which reflects the amount of the backcharge from Dunn. The record shows that Royal did not deny, by its answer, that the amount in controversy was $6,075.00. The problem is, however, further complicated by the fact that in its evidence, Art Metal only proved the sum of $5,325.00 on its accounting claim as against Royal.

In this entire proceeding, Art Metal has argued that both the subcontract between Dunn and Royal and the contract between Royal and Art Metal are within the Uniform Commercial Code. From this, Art Metal emphasizes that portion of the evidence which shows that Royal never advised Art Metal of the rejection or allowed Art Metal the opportunity to correct the defect. As observed, it has been found by this court under *Cork* that the subcontract between Royal and Dunn is not within the Uniform Commercial Code. The contract

between Royal and Art Metal was for goods sold exclusively, as Art Metal was only to fabricate the lockers and was to play no role in their installation. The evidence further reveals that as early as February, 1980, Royal knew of the rejection of the lockers by the architect and Dunn, and in turn Royal failed to notify Art Metal of the defects, and Royal did not permit Art Metal a reasonable time to correct the defects. The contract as between Royal and Art Metal clearly fell within the requirements of § 400.2–508 and § 400.2–602. The result was that Royal, as the buyer and by its action or rather in this case its inaction (failure to inform Art Metal), is held to have accepted the goods (lockers) from Art Metal.

On its claim for goods delivered (lockers), Art Metal, upon its evidence, established that it was entitled to only $5,325.00. Art Metal argues that Royal, by its answer, admitted that it owed Art Metal the sum of $6,075.00. Art Metal's argument fails for two reasons.

In its answer, Royal admitted that the sum in dispute was $6,075.00, but in that same pleading, Royal disclaimed that it owed Art Metal any amount. Thus, it is not completely accurate to conclude that Royal "admitted" it owed Art Metal the sum of $6,075.00. When that fact is added to the proof of Art Metal's claim, which revealed only the sum of $5,325.00 as due Art Metal by Royal, the conclusion is inescapable that the judgment in favor of Art Metal and against Royal, while valid, was valid only for the total sum of $5,325.00.

It is clear from the record that the evidence supported the claim for accounting by Art Metal as against Royal for the sum of $5,325.00. In addition, the record is clear that Dunn did not breach its contract with Royal and in turn, Dunn, as per the subcontract, was entitled to terminate the subcontract, secure completion of the work through another contractor and to backcharge Royal for the sum of $6,075.00.

The judgment of the trial court was supported by substantial evidence, it was not against the weight of the evidence and

did not erroneously declare or apply the law. *Murphy v. Carron, supra.*

The judgment is affirmed, but it is modified as to the amount of recovery by Art Metal as against Royal, said sum being reduced from $6,075.00 to $5,325.00.

All concur.