**MISSOURI FARMERS ASSOCIATION, Respondent,**

v.

**Donald McBEE, Appellant.**

**No. WD 41753.**

Missouri Court of Appeals, Western District.

Feb. 27, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 24, 1990.

James P. Valbracht, Cleaveland, Macoubrie, Cox, Valbracht and Elliott, Chillicothe, for appellant.

George W. Richardson, Kansas City, for respondent.

Before BERREY, P.J., and TURNAGE and ULRICH, JJ.

ULRICH, Judge.

Donald McBee appeals from judgment entered for Missouri Farmers Association, Inc. (MFA), a Missouri corporation, on MFA's claim and his counterclaim, following a judge-tried case. The respondent filed suit on account for spraying appellant's soybeans with a herbicide pursuant to agreement, and appellant counterclaimed for the net value of his soybean crop, alleging that the herbicide killed virtually all of his fifty-one acres of soybeans. The judgment is reversed in part and affirmed in part.

Donald McBee had farmed for more than forty-two years and had raised soybeans for at least twenty-five years. He farmed in Carroll County. Mr. McBee hired Jim Clevenger, a farmer who had grown soybeans for over thirty years, to plant his 1986 soybean crop. Mr. Clevenger planted

the crop on the 5th or 6th day of June, 1986.

On July 26, 1986, pursuant to agreement between MFA and Mr. McBee, MFA sprayed all but a fourteen-foot strip of Mr. McBee's fifty-one-acre soybean field. Mr. McBee had requested that the respondent spray his soybean field for cocklebur. MFA selected the chemical sprayed and when and how the beans were sprayed. The soybeans were a good color and good height the evening before they were sprayed. The evening after the beans were sprayed, virtually all the sprayed beans on the fifty-one-acre field were brown, crumbly, dry, and within two or three days they were dead. The beans within the fourteen-foot unsprayed strip maintained their good stand and good color.

The evidence during trial consisted of testimony, exhibits and stipulated facts. Although the parties did not stipulate to the chemical sprayed, they stipulated that the sum of $749 was a fair and reasonable charge for the chemical sprayed and the service rendered and that the reasonable value of soybeans in 1986 was $4.60 per bushel. Mr. McBee estimated that he would have incurred a combining expense of $20 per acre, $1,020 for the entire field. He estimated that hauling expenses would have been $.15 per bushel, and he estimated the yield for the soybean field would have been 35 bushels per acre. He claimed damages for the loss of 1,785 bushels of soybeans at $4.60 per bushel totaling $8,211, less combining expense of $1,020 and hauling expense of $267.75. He claimed damages in the sum of $6,923.25.

Dr. George Wright, an employee of MFA and a soil expert testified as MFA's expert witness. He has earned a masters degree and a Ph.D degree in soil chemistry. He examined Mr. McBee's soybean field during the first week of September 1986. He had no personal knowledge what chemical was sprayed, and no other evidence was introduced identifying the chemical used. Overruling Mr. McBee's objection, the court permitted the witness to testify that the chemical Dyanap was sprayed on Mr.

McBee's soybean crop. He testified that the chemicals Alanap and Dinitro are mixed to form Dyanap. The record is void of any evidence establishing how the witness knew or concluded the chemical sprayed.

Dr. Wright took soil samples in September 1986 from the acreage sprayed by MFA. The samples were sent to a University of Missouri laboratory for analysis. Presumably, the laboratory analysis report reflects the test results of the samples taken by Dr. Wright of Mr. McBee's soybean field. No foundation was laid for the report's introduction, and it was not admitted as evidence. Over Mr. McBee's objection, the court permitted Mr. Wright to testify about the content of the laboratory report. Dr. Wright testified that the pH content of the soil samples was 5.1 and should have been 5.6 or higher for adequate soybean growth. He stated that the soil samples were ten times more acidic than is conducive to good bacterial activity to facilitate good soybean growth. The report, he said, reflected that the soil samples contained a phosphorus rating of 10, and he stated that "The University considers a reading of 4 to 6" best. The pH and the phosphorous content of the sampled soil, although not optimum, would not kill soybean plants and would not cause a green plant to turn brown and crispy within two or three days, Dr. Wright said. Dr. Wright also stated that the appellant's soybean field was not worth combining when he saw it in September 1986.

Mr. McBee alleges two points of error. He contends, as point 1, that the weight of the credible evidence is against the judgment. As point 2, Mr. McBee contends that the court erred by permitting MFA's expert witness, Dr. George Wright, to testify (a) what chemicals were sprayed on appellant's soybeans, and (b) what the results were of the University of Missouri laboratory tests of the soil samples taken from his soybean field.

When reviewing a court-tried case this court will not disturb the trial court's judgment unless it is against the weight of the evidence, is not supported by substantial evidence or erroneously applies or declares

the law. *Citizens State Bank of Marshfield v. Friendly Ford, Inc.*, 686 S.W.2d 565, 567 (Mo.App.1985). Review is equitable in nature being upon both the evidence and the law. *Watkins v. Johnson*, 606 S.W.2d 493, 495 (Mo.App.1980).

Because this court's ruling on point 2 affects the evidence considered, and, therefore, point 1, point 2 is reviewed first. Point 2 has two parts. Mr. McBee contends that the trial court erred by permitting MFA's expert witness to testify (a) what chemicals were sprayed on appellant's soybeans, and (b) what the results were of the University of Missouri laboratory tests of the soil samples taken from his soybean field.

■ Dr. Wright testified in behalf of MFA as an expert on soil chemistry. His credentials were not contested, and the trial court recognized him as an expert witness. He was asked on direct what chemical was used to spray Mr. McBee's soybean crop. Mr. McBee voir dired the witness before the witness answered the question, and Dr. Wright said he did not have personal knowledge of what chemical was used. Mr. McBee then objected that the witness was incompetent to testify what chemical was sprayed. The court overruled the objection and permitted the witness to state absent additional foundation that Dyanap was the chemical applied to Mr. McBee's soybean crop. The witness explained what chemicals constitute Dyanap and their effects on soybeans and specific undesired flora. He testified that Dyanap makes soybeans turn brown because it burns the leaves, but normally, soybeans recover when growing conditions are adequate. The expert's testimony was significant because it was the only evidence of the chemical sprayed and its effect on soybeans and other foliage.

Dr. Wright did not have direct knowledge of the chemical sprayed. No one else testified what chemical was sprayed, and records of the chemical sprayed were not qualified as business records and were not introduced as an exception to the hearsay exclusion rule. Dr. Wright did not testify how he knew or concluded which chemical

was sprayed. No competent evidence established the chemical sprayed on Mr. McBee's soybean crop. The trial court erroneously overruled Mr. McBee's objection, and Dr. Wright's testimony of the chemical sprayed should have been excluded.

■ Dr. Wright was questioned by MFA about the laboratory analysis report of the soil samples taken in September by him from Mr. McBee's soybean field. Before responding to MFA's initial question about the report's contents, Mr. McBee objected. No evidence was presented that Dr. Wright analyzed the soil samples, and the laboratory report was hearsay. No foundation was laid to qualify the report or any part of it as an exception to the hearsay rule, and the report was not introduced as evidence. Dr. Wright's testimony was offered to prove as true those things in the report about which he testified. Dr. Wright's testimony about the report was hearsay and not qualified as an exception to the hearsay rule.

MFA cites *Albers v. Hemphill Contracting Co., Inc.*, 740 S.W.2d 660, 663 (Mo.App. 1987), as authority to permit an expert to testify using information compiled by someone else. The expert in *Albers* could not adequately explain an imperfection in a report that she used as foundation for her testimony. The court ruled that anything that the expert could not explain in the report should be directed to the weight and sufficiency of the proffered evidence rather than to its admissibility. MFA's reliance on *Albers* is misplaced. *Albers* does not abandon the hearsay exclusion rule when an expert testifies. The report about which the expert in *Albers* testified was a summary of information extracted from business records which were themselves admissible as evidence and available to the opposing party for inspection. *Id.* The report was offered as evidence after foundation was laid. In this case, MFA did not lay foundation sufficient to introduce the soil analysis report, and the report was not offered as evidence. Dr. Wright did not analyze the soil samples, was not present when analysis was made, and he did not prepare the report. Dr. Wright's testimo-

ny about the report's content should not have been permitted without proper foundation for the report being laid. The court erred by overruling Mr. McBee's objection.

▬ Mr. McBee's point one is now considered. In reviewing a court-tried case, this court considers the evidence which was properly admitted and excludes from consideration evidence which was improperly admitted. *Blair v. Blair*, 600 S.W.2d 143, 146 (Mo.App.1980). Dr. Wright's testimony about the chemical sprayed on Mr. McBee's soybean field and the analysis of the soil samples taken from the soybean field is excluded from consideration because it was improperly admitted. No other evidence was offered proving the chemical sprayed or the soil contents of Mr. McBee's soybean field.

The properly-admitted evidence relevant to the spraying of the soybeans proves that pursuant to agreement Mr. McBee's soybean field was sprayed with something. However, the evidence does not prove that a herbicide was sprayed. Before the crop was sprayed, the soybeans were a good height and color. They were healthy. The evening after the beans were sprayed they were brown, dry, and appeared to be dead, and virtually all of the sprayed beans died within two or three days. The fourteen-foot unsprayed bean strip remained healthy. Even assuming, arguendo, that the soil's pH and phosphorous content were not optimum for the best growth, the soil condition would not have caused healthy green soybean plants to die within two or three days. The bean field was unfit for harvest. The judgment in favor of MFA on its claim against Mr. McBee is not supported by substantial evidence.

Mr. McBee contends that MFA breached an implied warranty that the chemical sprayed was fit for the ordinary purpose for which it was used, spraying soybean fields to eradicate cocklebur. § 400.2–314, RSMo 1986. He also contends that MFA breached an implied warranty that the chemical sprayed was fit for a particular purpose, spraying a soybean field to kill cocklebur. § 400.2–315, RSMo 1986. While Mr. McBee pleads the theories gener-

ally, he cites and relies upon § 400.2–314 and § 400.2–315 in his brief.

▬ The statutory sections relied upon by Mr. McBee are found in Missouri's codification of the Uniform Commercial Code. Provisions of the U.C.C. apply only to transactions in goods. § 400.2–102. The term goods, as defined by § 400.2–105, means things which are moveable. The contract here was a hybrid or mixed contract in that it was for both goods and services. A characterization of this contract as a service contract negates the applicability of the U.C.C. The dominant element test is applied to determine the nature of a contract. *Cork Plumbing Co. v. Martin Bloom Associates*, 573 S.W.2d 947, 958 (Mo.App.1978). The question is whether the contract's predominant purpose is the rendition of service, with goods incidentally involved, or is a transaction for sale, with services incidentally involved. *Id.* See also, *Art Metal Products Co. of Chicago v. Royal Equipment Co.*, 670 S.W.2d 152, 156 (Mo.App.1984). Applying this test to the present facts, it appears that the dominant element of the contract was service. Mr. McBee contacted MFA about spraying his beans to eradicate cocklebur; MFA selected the chemicals used and when and how the spraying was done.

▬ The application of § 2–314 and § 2–315, the U.C.C.'s warranty provisions, to a service contract has not been directly addressed by Missouri courts. Guidance is provided, though, in *Hanes v. Bacon Sales Co.*, 602 S.W.2d 50, 53 (Mo.App.1980). In that case the court did not render a holding as to whether U.C.C. warranty provisions apply to a contract to repair a tractor. The court did, however, cite cases from other jurisdictions as being persuasive on the issue. In *Samuelson v. Chutich*, 187 Colo. 155, 529 P.2d 631, 633 (Colo.1974), the Supreme Court of Colorado stated: "We regard it as the better part of wisdom not to extend as a matter of law implied warranties from sales to service contracts. We believe it the better rule to limit liability to acts of negligence." *Id.* See also, *Lee v. C & P Service Corp.*, 363 So.2d 586, 588 (Fla.App.1978). (Sections of the U.C.C. re-

 

lating to implied warranty are not applicable to a contract for service.) This court agrees with the Colorado court and holds that implied warranties do not apply to service contracts. Such a holding is consistent with both the reasoning of Missouri cases like *Cork Plumbing Co.* and *Art Metal Products Co.* and the spirit behind the U.C.C.

Judgment in favor of MFA on its petition is reversed. Mr. McBee failed to state a claim in his counterclaim for breach of implied warranties against MFA, and judgment in favor of MFA on Mr. McBee's counterclaim is affirmed.

All concur.