

# In the Missouri Court of Appeals Eastern District

## DIVISION FOUR

CARLOS JONES,                              )         No. ED102633
                                           )
                    Appellant,             )         Appeal from the Circuit Court
                                           )         of Saint Charles County
vs.                                        )
                                           )         Honorable Daniel G. Pelikan
GALAXY 1 MARKETING, INC., et al.,          )
                                           )
                    Respondents.           )         FILED: December 22, 2015

## Introduction

Carlos Jones ("Jones") appeals the trial court's grant of summary judgment for

respondents Galaxy 1 Marketing, Inc., Lawrence Eckert, and Tyrone Janota (referred to

collectively as "Galaxy"). On appeal, Jones argues that the trial court erred in granting summary

judgment on three separate counts. Jones contends the trial court erred in granting summary

judgment on his claim for wrongful discharge (Count I); on his claim of discrimination asserted

under the Missouri Human Rights Act (Count II); and on his claim for unpaid wages under

Section 290.110[1] (Count VI).

None of the statutes cited by Jones supports his assertion of the public-policy exception

to at-will employment. Because Jones cannot assert the public-policy exception, he could be

terminated for his job for any reason or for no reason. Accordingly, Galaxy was entitled to

---

[1] All statutory references are to RSMo (2000), unless otherwise noted.

judgment on Jones's wrongful-termination claim, and summary judgment was proper on Count I. Because the uncontroverted summary-judgment evidence shows that race was not a contributing factor in Jones's termination, summary judgment was proper as to Count II. Because Jones's demand for unpaid wages under Section 290.110 was untimely, summary judgment was proper as to Count VI. We affirm the trial court's grant of summary judgment.

## Factual and Procedural History

Galaxy hired Jones as an at-will employee in June of 2011 to work as a satellite technician installing residential satellite receivers for a third party, Dish Network. Consumers purchased satellite television service from Dish Network, which in turn contracted with Galaxy to install the satellite dish and activate the television programming. Consumers interacted with the Galaxy satellite technician, who went to consumers' homes and installed the satellite service. After a week and a half, Galaxy promoted Jones to a trainer.

One aspect of Jones's job was to establish "connectivity" at the consumer's home. Connectivity enabled a two-way communication between Dish Network and the consumer's satellite receiver. Without connectivity, the consumer's receiver obtained television programming from Dish Network, but the connection was only one way.[2] When established by the satellite technician, two-way connectivity provided consumers additional features, including the ability to purchase pay-per-view programming. Connectivity also benefited Dish Network by allowing remote monitoring and troubleshooting; for example, Dish Network could detect problems and dispatch repair services without the consumer reporting the issue.

Dish Network paid Galaxy an incentive bonus when Galaxy established connectivity at a residence. Connectivity required that the consumer have a landline telephone or an internet

---

[2] With a one-way connection, Dish Network could send television programming to a consumer's satellite receiver, but that receiver could not send information back to Dish Network.

2

connection to facilitate two-way communication. When a Galaxy technician established connectivity, a receiver-specific code was generated, and this code verified that Dish Network was capable of sending and receiving signals to the consumer's receiver. The Galaxy technician wrote that verification code in the consumer's paperwork. Dish Network checked the written code against its system to confirm that the written code was "good." Dish Network paid bonuses to Galaxy for these "good" codes, which indicated connectivity had been established with the consumer. Jones neither did any of the billing for Galaxy nor saw any of Dish Network's bills.

Establishing connectivity with Dish Network consumers required a landline telephone or internet connection. In situations where the consumer had no landline or internet connection, Galaxy instructed its technicians, including Jones, to use their cell phones to simulate connectivity with the consumer. This technique required Jones to use a wi-fi adapter, which allowed the consumer's satellite receiver to access the internet through Jones's cell-phone connection. The connectivity established by this procedure was temporary, but sufficient in duration to allow the consumer to obtain a "good" code from Dish Network. Galaxy earned its bonus from Dish Network upon turning in the connectivity code. However, Dish Network's connectivity with the consumer soon was lost because the consumer's home lacked a permanent internet connection.

Jones alleges that he refused to establish temporary connectivity with consumers because he believed the practice was deception, fraud, theft, and embezzlement. Jones voiced his concerns at a company meeting on September 16, 2011. Immediately after the meeting, Jones discussed the situation with a manager, Tyrone Janota ("Janota"). Jones said that "if [the practice] was right for us to do, you guys wouldn't be so hush hush about it." Jones believed the practice was "illegal because you guys are getting paid for this connectivity." Jones had a

3

similar discussion with Lawrence Eckert ("Eckert"), Jones's immediate supervisor. Eckert asked Jones if he was refusing to establish this temporary connectivity. Jones responded that he would not establish temporary connectivity. Jones did not receive any installation jobs that Saturday, September 17, 2011, or the following Monday, September 19, 2011.

Galaxy fired Jones on Tuesday, September 20, 2011. Galaxy's stated reason was performance. Jones, an African American, claims that Galaxy gave Caucasian employees additional training when those employees had performance problems, but Galaxy fired Jones without offering that opportunity. Jones also claims that Matt Rydell ("Rydell"), a Caucasian satellite installer, had worse performance than Jones and had "messed up" most of the installations that Rydell performed. Jones contends that other Caucasian technicians had worse performance records than he, and that Galaxy gave him assignments in areas "like East St. Louis, the very bad parts of town," while Caucasian technicians, such as Rydell, worked in areas such as Chesterfield and Creve Coeur.

In February of 2012, almost five months after his dismissal, Jones filed a written demand to Galaxy alleging Galaxy owed him unpaid wages. Subsequently, Jones filed suit. Jones's six-count First Amended Petition alleged claims for wrongful termination (Count I), discrimination under the Missouri Human Rights Act (Count II), breach of contract (Count III), unjust enrichment (Count IV), quantum meruit (Count V), and unpaid wages under Section 290.110 (Count VI). Jones directed Count II at all three defendants (Galaxy, Janota, and Eckert) but directed the remaining counts only at Galaxy. Galaxy filed a motion for summary judgment, which the trial court granted as to Counts I, II, III, and VI. Jones voluntarily dismissed the

4

remaining counts (Counts IV and V) with prejudice. Jones then filed his timely Notice of Appeal with this Court.[3] This appeal follows.

## Points on Appeal

Jones raises three points on appeal. First, Jones argues that the trial court erred in granting summary judgment on Count I of his petition for wrongful termination. Specifically, Jones asserts that although he was an at-will employee, his termination was wrongful because it comes within the public-policy exception to the at-will employment doctrine. Second, Jones argues that the trial court erred in granting summary judgment on Count II of his petition for a violation of the Missouri Human Rights Act. Specifically, Jones asserts that genuine issues of material fact remain as to whether his race was a contributing factor in his termination. Third, Jones argues that the trial court erred in granting summary judgment on Count VI of his petition for a violation of Section 290.110 because the statute does not require that a demand for payment be made within a specified period of time.

## Standard of Review

Jones contests the trial court's grant of summary judgment on Counts I, II, and VI. Summary judgment is appropriate where the moving party has demonstrated a right to judgment as a matter of law, based on facts not genuinely disputed. ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 386 (Mo. banc 1993); Rule 74.04.[4] Where the defending party is the movant, it may establish a right to judgment by showing one or more of the following: (1) facts negating any one of the non-movant's element's facts; (2) that the non-movant, after an adequate period of discovery, has not been able and will not be able to produce

---

[3] Galaxy asserts that no "final judgment," specifically denominated as such, exists. However, when a court grants partial summary judgment and parties voluntarily dismiss the remaining claims, the partial summary judgment becomes a final judgment because no other claims are pending. Stewart v. Liberty Mut. Fire Ins. Co., 349 S.W.3d 381, 384–85 (Mo. App. W.D. 2011).

[4] All rule references are to Mo. R. Civ. P. (2015).

5

evidence sufficient to allow the trier of fact to find the existence of any one of the non-movant's elements; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense. ITT Commercial Fin. Corp., 854 S.W.2d at 381. When considering an appeal from a grant of summary judgment, we review the record in the light most favorable to the party against whom judgment was entered. Id. at 376. The non-movant receives the benefit of all reasonable inferences from the record. Id. We take facts set forth in support of the motion as true unless contradicted by the non-moving party's response to the motion. Id. Since we do not defer to the trial court's order granting summary judgment, our review is essentially *de novo*. Id.

Discussion

## I.    Point One—Wrongful Termination (Count I)

The principle of at-will employment is well-established in Missouri law. Margiotta v. Christian Hosp. Ne. Nw., 315 S.W.3d 342, 345 (Mo. banc 2010). The at-will employment doctrine has been firmly established in Missouri for at least 130 years. See Finger v. Koch & Schilling Brewing Co., 13 Mo. App. 310, 311 (Mo. App. St. Louis 1883). "An indefinite hiring, at so much per day, per month, or per year, is a hiring at will, and may be terminated by either party at any time." Id. This well-established at-will employment doctrine has persisted in the absence of a contract for a definite term or a contrary statutory provision. Christy v. Petrus, 295 S.W.2d 122, 124 (Mo. banc 1956). At-will employment is historically employer-friendly, as an employer may terminate an employee "for any reason or for no reason." Margiotta, 315 S.W.3d at 345. Jones does not dispute that he was an at-will employee, but asserts that his termination falls within an exception to the at-will employment doctrine: the public-policy exception. The public-policy exception was articulated in 1985 by the Western District in Boyle v. Vista Eyewear, Inc., 700 S.W.2d 859, 877–78 (Mo. App. W.D. 1985), and not recognized by our

6

Supreme Court until 2010.  See Fleshner v. Pepose Vision Institute, P.C., 304 S.W.3d 81, 92 (Mo. banc 2010); Keveney v. Missouri Military Acad., 304 S.W.3d 98, 101 (Mo. banc 2010); Margiotta, 315 S.W.3d at 346.

The public-policy exception is "very narrowly drawn." Margiotta, 315 S.W.3d at 345. The public-policy exception provides a cause of action for an at-will employee who has been discharged in violation of a clear mandate of public policy. Id. The clear mandate of public policy must be reflected "in the letter and purpose of a constitutional, statutory, or regulatory provision or scheme, in the judicial decisions of state and federal courts, in the constant practice of government officials, and, in certain instances, in professional codes of ethics." Delaney v. Signature Health Care Foundation, 376 S.W.3d 55, 56 (Mo. App. E.D. 2012). Without the public-policy exception, employers could discharge employees, without consequence, when the employee is doing that which is *beneficial* to society. Fleshner, 304 S.W.3d at 92.

Missouri law recognizes four categories of cases that are encompassed within the public-policy exception to at-will employment: (1) termination of employees who refuse to obey directions to commit a crime or to act contrary to public policy; (2) termination of employees who report wrongdoing or violations of law or public policy by their employers or fellow employees; (3) termination of employees who engage in actions normally encouraged by public policy, like reporting to jury duty or joining a labor union; and (4) termination of employees who file claims for workers' compensation. Hughes v. Bodine Aluminum, Inc., 328 S.W.3d 353, 356 (Mo. App. E.D. 2010).

Jones posits that his cause of action in Count I falls within two categories of the public-policy exception. Jones first argues that his refusal to establish temporary connectivity with his cell phone and wi-fi adapter constitutes a refusal to commit a crime or to violate clearly

7

mandated public policy as expressed in the six separate statutes cited in his petition. Jones also contends that his termination violates the "whistleblower" public-policy exception because he was fired after he expressed to his supervisors his concerns that the practice of establishing temporary connectivity constituted deception, fraud, theft, and embezzlement. We will address Jones's latter argument first.

A.     <u>Jones is not a whistleblower entitled to the public-policy protection for at-will employees.</u>

The second category of the public-policy exception to the termination of at-will employees is commonly referred to as "whistleblowing." Jones argues that this category of the public-policy exception protects his conduct and provides him a cause of action against Galaxy because he was fired after complaining to his supervisors, Janota and Eckert, about the fraudulent nature of establishing temporary connectivity for a bonus. More simply stated, Jones asserts that he cannot be fired for "blowing the whistle" on the supervisors who required him to engage in unlawful or fraudulent conduct.

We first note that the uncontroverted summary-judgment evidence shows Jones did not express his concerns about the fraudulent nature of the conduct required of him to any one at Galaxy other than the immediate supervisors who instructed him to establish the temporary connectivity. Complaining of wrongdoing only to the wrongdoers does not fall within the public-policy exception because such complaint does not expose the wrongdoers. In <u>Drummond v. Land Learning Found.</u>, an employee complained of his suspicions of tax fraud "by the Evans brothers to the Evans brothers." 358 S.W.3d 167, 171 (Mo. App. W.D. 2011). By complaining of wrongdoing only to the wrongdoers, the Court held that the employee did not engage in whistleblowing protected under the public-policy exception because the employee did not expose the wrongdoers in a way that could remedy the wrong. <u>Id.</u>

8

Earlier cases also recognize that the whistleblower public-policy exception protects only employees who appropriately report to supervisors or other third parties. Fleshner, 304 S.W.3d at 97 n.13. "The public-policy exception explicitly recognizes that an employee's superiors can constitute the proper authority to whom to blow the whistle and that an employee who is fired for **informing his superiors of wrongdoing by other employees** is entitled to bring suit." Id. (emphasis added) (citing Faust v. Ryder Commercial Leasing & Services, 954 S.W.2d 383, 391 (Mo. App. W.D. 1997)). In Faust,[5] the employee reported criminal wrongdoing of his supervisors, King and Farris, but only to King. Faust, 954 S.W.2d at 391. Faust held that, to effectuate a clear mandate of public policy implicated by a given situation, it is "axiomatic that the at-will employee report or 'blow the whistle' to the proper authorities." Id. Depending on the circumstances, this reporting could be directed to the employer ("internal whistleblowing") or to a third-party authority ("external whistleblowing"). Id. The Faust Court held that the employee did not "expose" his supervisors (King and Farris) or their criminal activity because he only reported the conduct to one of the wrongdoers (King). Id. Thus, as the Faust Court explained, "there is no blowing of the proverbial whistle and the public policy mandate goes wanting." Id.

Similarly, here, the evidence shows that Jones "blew the whistle" on the alleged fraudulent activity only to Janota and Eckert, the two supervisors who instructed him to simulate connectivity with his cell phone (the alleged wrongdoing). Jones's complaints to these two individuals did not expose Galaxy in a way that could remedy the wrong because Jones complained only to the wrongdoers. Because Jones complained to only the wrongdoers,

---

[5] Fleshner abrogated Faust on other grounds, because Faust used the exclusive-causation standard, rather than the contributing-factor standard that Fleshner recognized. See Fleshner, 304 S.W.3d at 93.

9

Missouri law precludes him from invoking the whistleblower protection of the public-policy exception to at-will employment. See Drummond, 358 S.W.3d at 171; Faust, 954 S.W.2d at 391.

B.    Jones's refusal to establish temporary connectivity.

Jones next argues that his refusal to establish temporary connectivity also is encompassed within the public-policy exception to at-will employment. Regardless of whether he reported the wrongful conduct to the appropriate internal or external authority, Jones reasons that his refusal to establish a temporary connectivity with the Dish Network consumer constitutes a refusal to engage in conduct that either violated the law or was contrary to well-established, clearly mandated public policy expressed in various criminal statutes. Jones argues that granting summary judgment was error because a genuine issue of material fact exists as to whether his refusal to engage in the questionable conduct was a contributing factor in his termination.

When reviewing an employee's termination under the lens of the public-policy exception to the employer's right to terminate an at-will employee, we must determine if there exists a clear and focused public policy in a constitutional provision, a statute, regulation promulgated pursuant to statute, or a rule created by a governmental body. Fleshner, 304 S.W.3d at 96. To prove entitlement to a claim of wrongful termination asserted under the public-policy exception, a plaintiff is not limited to proving that the conduct required of him is a direct violation of a statute or regulation. Id. A plaintiff may properly assert the public-policy exception if his conduct would violate a clear public policy reflected by the cited authority. Id. Importantly, a "vague or general statute, regulation, or rule cannot be successfully pled" to establish a cause of action under the public-policy exception "because it would force the court to decide on its own what public policy requires." Margiotta, 315 S.W.3d at 346. We will not find public policy in the "varying personal opinions and whims of judges or courts … as to what they themselves believe to be the demands or interests of the public." Fleshner, 304 S.W.3d at 96.

10

Our first step in considering Jones's claim is to ascertain what public policy, if any, is espoused in the statutes cited by Jones. In Margiotta, a medical image technician sued his former employer, alleging that his employer terminated him for reporting violations of federal and state regulations relating to patient care in hospitals. 315 S.W.3d at 344. Margiotta had reported to his supervisors (1) that other employees were leaving patients unattended in the hospital's hallways; (2) that staff once dropped a patient because the hospital used only one orderly to transfer patients from a stretcher to a CT scanning table; and (3) that a pregnant woman underwent a CT scan, which Margiotta considered unsafe. Id. at 345. The trial court granted summary judgment in favor of employer Christian Hospital, holding that the regulations Margiotta cited did not constitute clear mandates of public policy required to invoke the public-policy exception, and that reporting the violations was not the cause of his termination. Id.

Margiotta claimed that his employment was protected by the public policy expressed through a federal regulation stating, "The patient has the right to receive care in a safe setting." Id. at 348. In rejecting Margiotta's argument, the Court reasoned that the regulation at issue empowered "*patients* to assert *their* right to safety." Id. (emphasis in original). "No textual part [of the regulation] grants protection to employees or requires specific conduct by an employee such as an affirmative duty to report violations." Id. Most importantly, the regulation did not specifically proscribe the three incidents Margiotta reported. Id. Thus, the regulation was deemed too vague to support the public-policy exception. Id.

The second regulation upon which Margiotta relied stated, "Each hospital shall develop a mechanism for the identification and abatement of occupant safety hazards in their facilities. Any safety hazard or threat to the general safety of patients, staff or the public shall be corrected." Id. at 345. This regulation appeared in a section titled "Fire Safety, General Safety

11

and Operating Features." Id. at 348. The Court held that the regulation proffered by Margiotta clearly related to building safety, and not patient treatment about which Margiotta was complaining. Id. The Court rejected Margiotta's argument that this general regulation provided a basis for invoking the public-policy exception unless the conduct Margiotta reported violated the regulation. Id. In affirming the grant of summary judgment in favor of the employer, the Court held that "mere citation" to a regulation was not enough without a demonstration of how the reported conduct actually violated the regulation. Id.

We note that Margiotta pursued his claim of wrongful discharge under the whistleblower public-policy exception, whereas Jones asserts his entitlement to the public-policy exception because he refused to engage in alleged fraudulent or criminal conduct. Id. at 346–47. We find that distinction inconsequential because the analysis of whether the public policy expressed by statute is too general or vague transcends the categories of public-policy exceptions. See Hedrick v. Jay Wolfe Imports I, LLC, 404 S.W.3d 454, 458 (Mo. App. W.D. 2013) (Margiotta's vague and general statute rule applies to the third category of the public-policy exception). To prevail in his claim, Margiotta was required to show that the conduct about which he was whistleblowing violated the law or a clear mandate of public policy. Similarly, Jones must demonstrate that the conduct in which he refused to participate would have violated either the law or a clear mandate of public policy. Regardless of the category argued by Jones, the public-policy exception to at-will employment does not apply if the statute or regulation that serves as the source of the public policy is too general or vague.

The general and vague regulations rejected as a basis for the public-policy exception in Margiotta contrast with the specific statutes our Supreme Court accepted as a clear mandate of public policy in Fleshner. In Fleshner, the United States Department of Labor was investigating

12

an employer for potential overtime compensation violations. Fleshner, 304 S.W.3d at 86. During the investigation, a *federal* Department of Labor investigator called Fleshner at home seeking background information on her employer. Id. Fleshner provided information to the investigator and told her employer about the call the following morning. Id. Fleshner was terminated shortly thereafter. Id. Fleshner claimed that she was wrongfully terminated, and argued that Missouri's minimum wage law expressed the public-policy allowing her to claim the protections of the public-policy exception to the termination of her at-will employment. Id. at 96.

Missouri's minimum wage statute regulated the payment of overtime compensation, gave state officials the authority to investigate employers, and specifically prohibited employers from discharging employees who notified the appropriate *state* officials that the employer failed to pay overtime compensation. Id. The employer argued that Fleshner could not assert the public-policy exception to her discharge because Fleshner relied upon a state statute that protected communications with *state* investigators, whereas Fleshner was allegedly terminated for communicating with *federal* investigators. Id. The employer argued that Fleshner did not engage in an activity protected by the minimum wage law. Id. In rejecting the employer's argument and allowing Fleshner to assert the public-policy exception, the Supreme Court noted that a plaintiff need not rely on a direct violation of a statute or regulation to invoke the public-policy exception, but may rely upon the public policy reflected by the statute. Id. The Court held that the state minimum wage law demonstrated a clear mandate of public policy encouraging employees to communicate with government labor investigators about their employer's overtime compensation without fear of retaliation. Id. at 97. Thus, Fleshner could

13

rely on the public-policy exception to challenge her termination of employment despite her inability to show a direct violation of the law. See id.

In summary, a plaintiff asserting the public-policy exception for refusing to engage in questionable conduct must show the plaintiff was terminated because plaintiff did not obey directions either (1) to commit a crime, or (2) to act contrary to public policy. Hughes, 328 S.W.3d at 356. Conduct demonstrating a direct violation of a law, that is, a law specifically proscribing the action that the employer requires of the employee is sufficient to invoke the protections afforded by the public-policy exception to at-will employment. See Margiotta, 315 S.W.3d at 348; see also Beasley v. Affiliated Hosp. Products, 713 S.W.2d 557, 559, 561 (Mo. App. E.D. 1986) (adopting the position that if an employee's compliance with employer instructions would have resulted in criminal actions, there is a clear violation of public policy as announced by the legislature). However, even absent a showing that the conduct required of the employee does not directly violate the law, the public-policy exception may still be invoked provided the law specifically reflects a clear mandate of public policy that runs contrary to the conduct that the employer required. See Fleshner, 304 S.W.3d at 96.

Jones suggests that the conduct Galaxy required of him would violate either the letter or the well-established, clearly mandated public policy of six different statutes. Jones asserts that each statutory provision meets the public-policy exception individually. Accordingly, we will address each statute to determine if Galaxy required Jones to engage in conduct that either would violate said statute or constitute an act contrary to the clearly mandated public policy of said statute. Should we determine that the public-policy exception applies, we must then determine if a genuine issue of fact exists as to whether Jones's refusal to establish temporary connectivity was a contributing factor in his termination. Fleshner, 304 S.W.3d at 95. If both the public-

14

policy exception applies and a genuine issue of material fact exists as to whether Jones's refusal to act was a contributing factor in his termination, summary judgment is improper.

### 1. Stealing, Section 570.030.1(1)

Jones first asserts that the Missouri's criminal stealing statute, Section 570.030.1(1) provides him a basis for asserting the public-policy exception. We disagree.

Section 570.030.1(1) is Missouri's general stealing statute. We are aware of no judicial authority, and neither party has provided any case law wherein this statute has been cited as the source of any clear public policy in the context of a wrongful-discharge claim. Section 570.030(1) is the same type of general law that the Margiotta Court rejected as a basis for applying the public-policy exception.

Applying the principles of the public-policy exception announced in Margiotta and Fleshner to the matter before us, we note that a person commits the crime of stealing when he "appropriates property or services of another with the purpose to deprive him or her thereof, either without his or her consent or by means of deceit or coercion." Section 570.030.1 (Cum. Supp. 2013). As discussed above, Section 570.030.1 is a general stealing statute containing broad language that facially applies in many situations. Similar to the regulations invoked by the employee in Margiotta, the general language and applicability of Section 570.030.1 does not support an expression of a clearly mandated public policy. To the contrary, the general language of the statute does not support any clear or focused policy other than "thou shalt not steal" and would leave it to the courts to determine the public policy intended by the legislature. This we cannot and will not do. Accordingly, for Jones to invoke the public-policy exception under the general stealing statute, he must produce evidence that Section 570.030.1 specifically proscribed the conduct Galaxy required of him. See Margiotta, 315 S.W.3d at 348. In other words, Jones

15

must show that establishing temporary internet connectivity with the Dish Network consumer constitutes a direct violation of Section 570.030(1).

Jones has not shown how Section 570.030.1 specifically prohibits the conduct required of him by Galaxy. The summary-judgment evidence supports a finding that Galaxy required Jones to establish temporary internet connectivity to acquire a "good" code from Dish Network. Galaxy then required Jones to submit the "good" code with the rest of the consumer's paperwork. Notably, this conduct was the extent of Jones's participation. Jones was not involved in any billing for Galaxy or even saw any of Dish Network's bills. We are unpersuaded that the act of establishing temporary internet connectivity runs afoul of Section 570.030.1 or subjected Jones to criminal liability under that statute. Galaxy did not require Jones to appropriate any property or service from Dish Network, and thus the conduct required of him did not constitute stealing under Section 570.030.1.

Section 570.030.1 is a general statute. Jones must show that the conduct Galaxy required of him was a crime as a prerequisite to asserting the public-policy exception in his claim for wrongful discharge. Because Jones cannot show that he refused to act in a way that directly violated Section 570.030.1, he is unable to rely on this statute to assert the public-policy exception to his at-will employment.

## 2. Deceptive Business Practice, Section 570.140

Jones next asserts that the Deceptive Business Practice Act also affords him the protection of the public-policy exception in his claim of wrongful termination. Jones relies on three different provisions of Section 570.140 to support his contention that the public-policy exception applies.

We again note that Section 570.140 is the same type of general criminal statute as the stealing statute discussed above. While Section 570.140 is less general than the stealing statute

16

because it only applies in the course of a business, occupation, or profession, Section 570.140 is still a statute that applies generally to acts of deception. Section 570.140 is unlike the anti-retaliation law in Fleshner, which focused specifically on employees' discussions with state government investigators about minimum wage issues. 304 S.W.3d at 96. The specific nature of the statute in Fleshner reflected a clearly mandated public policy encouraging free communication with government labor investigators, regardless of whether they worked for the state or federal government. Id. at 97. The general nature of Section 570.140 does not allow us to read any clearly mandated public policy into the statute. See Fleshner, 304 S.W.3d at 96 (clearly mandated public policy cannot be found in the opinions or whims of judges or courts). Accordingly, Section 570.140 can support Jones's claim of protection under the public-policy exception only if his supervisor's instructions would force him to directly violate the statute. See Beasley, 713 S.W.2d at 561.

A person commits the crime of "deceptive business practice" under Section 570.140.1 if that person, in the course of engaging in a business, occupation, or profession, recklessly:

> (1) Uses or possesses for use a false weight or measure, or any other device for falsely determining or recording any quality or quantity; or
>
> …
>
> (4) Sells, offers or exposes for sale adulterated or mislabeled commodities; or
>
> (5) Makes a false or misleading written statement for the purpose of obtaining property or credit.

Regarding subsection .1(1), Jones argues "the use of a cell phone to simulate internet connectivity of the satellite dish system equals the use of a 'device' for 'falsely determining or recording quality or quantity.'" While this argument is somewhat inviting on its face, we are not persuaded. Neither party has supplied—and after an extensive search, we have not found—any Missouri authority interpreting the meaning of subsection .1(1). Based on the text alone, Section

17

570.140.1(1) appears aimed at, for example, the scale that improperly weighs goods that are priced and sold by the weight. The statute protects a buyer who must rely on the measurement of a seller in purchasing something. Jones's conduct of establishing temporary connectivity seems not to align with the purpose of the deceptive business practices statute. Given the narrow nature of the public-policy exception and the absence of authority interpreting what is—and what is not—a deceptive business practice under Section 570.140.1(1), we are not convinced that Jones has demonstrated how this subsection specifically proscribes the conduct that Galaxy required Jones to take. See Margiotta, 315 S.W.3d at 348. Given the record before us, Jones cannot rely on this subsection to establish the public-policy exception.

Regarding subsection .1(4), the record shows that Galaxy was not selling mislabeled commodities. A "commodity," as defined in another chapter of the Missouri Revised Statutes, includes agricultural products, metals and minerals, fuels, foreign currency, and "all other goods, articles, products or items of any kind," with a few exceptions. Section 409.800(4). Galaxy sold the service of installing satellite television service, not commodities. Therefore, this subsection does not apply because Jones cannot show that the conduct required of him would violate the statute. Jones could not rely on this subsection for the public-policy exception.

Regarding subsection .1(5), Jones has not shown that he was required to make misleading statements for the purpose of obtaining property. Jones's participation in the alleged scheme ended when he wrote down the "good" code on the consumer's paperwork. Jones was simply required to establish temporary connectivity and record the "good" code. Jones was not involved in the billing, nor did he ever see Dish Network's bills from Galaxy. If anyone at Galaxy made a false or misleading statement to Dish Network, it was not Jones. Nor did Jones do anything "for the purpose of obtaining property or credit." Any alleged payments from this scheme went to

18

Galaxy, not to Jones. Because the conduct required of Jones by Galaxy did not violate subsection .1(5), Jones cannot rely on this subsection to assert the public-policy exception.

### 3. Missouri Merchandising Practices Act, Section 407.020

Section 407.020 of the Missouri Merchandising Practices Act ("MMPA") prohibits the use of "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Section 407.020.1 (Cum. Supp. 2013). Missouri courts consistently reinforce "the plain language and spirit of the [MMPA] to further the ultimate objective of consumer protection." Gibbons v. J. Nuckolls, Inc., 216 S.W.3d 667, 670 (Mo. banc 2007). The legislature enacted the MMPA to protect *consumers*. Chochorowski v. Home Depot U.S.A., 404 S.W.3d 220, 226 (Mo. banc 2013).

Jones's argument that the public policy expressed by the MMPA supports his claim of unlawful termination is unavailing because Dish Network is not a consumer. No evidence suggests Galaxy's actions affected consumers—the end-users of Dish Network's satellite television service. Regardless of Galaxy's alleged scheme, consumers did not acquire permanent internet connectivity with Dish Network. With or without connectivity, those consumers received their bargained-for television service from Dish Network. The record lacks any summary-judgment evidence to suggest that Galaxy technicians made fraudulent statements to any consumers. Instead, the alleged fraud, if any, arises from misrepresentations that Galaxy (not its technicians) made to *Dish Network*. Nor does the record contain any summary-judgment evidence to suggest that consumers bore the cost of the temporary connectivity—for example, through an increased monthly bill reflecting the bonus Dish Network paid to Galaxy. Dish Network is not a consumer in need of protection as contemplated by the well-established and clearly mandated public policy of the MMPA. Therefore, the MMPA does not apply, and Jones

19

cannot use the MMPA to invoke the public-policy exception in support of his claim for wrongful discharge.

### 4. U.C.C. Obligation of Good Faith, Section 400.1-203

Jones next relies on the Uniform Commercial Code's obligation of good faith, as codified in Section 400.1-203, to assert the public-policy exception. Section 400.1-203 states that "[e]very contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement." This provision is the type of general statute rejected in Margiotta as supporting a claim premised upon the public-policy exception

As discussed above, the second regulation in Margiotta, directed that any safety hazard to the general safety of patients must be corrected. 315 S.W.3d at 348. While the language of the statute was broad, the Court noted that the regulation specifically applied to building safety. Id. The Court explained that because Margiotta raised concerns of patient safety, not building safety, he could not rely on the general language of the regulation unless he demonstrated how the conduct he reported actually violated the regulation. Id.

Likewise, Jones relies on the general language of the U.C.C. obligation of good faith to support his claim of wrongful discharge, but cannot demonstrate how Galaxy's conduct actually violated Section 400.1-203. Provisions of the U.C.C. apply only to transactions involving the sale of goods. Missouri Farmers Ass'n v. McBee, 787 S.W.2d 756, 760 (Mo. App. W.D. 1990). The U.C.C. defines goods as things that are moveable. Id. Conversely, if the contract is a contract for services, the U.C.C. does not apply. Id. If the contract is a hybrid contract involving both goods and services, the question is whether the contract's predominant purpose is providing services—with goods incidentally involved—or is a transaction for sale—with services incidentally involved. Id.

20

Galaxy technicians installed Dish Network satellite service in consumers' homes. In Art Metal Products Co. of Chicago v. Royal Equip. Co., a general contractor contracted with a subcontractor to provide and install custom-built athletic lockers. 670 S.W.2d 152, 155 (Mo. App. W.D. 1984). The Court held that the subcontractor was not simply a provider or seller of the lockers, but more importantly, the subcontractor's role was of the installer of the custom lockers. Id. Thus, the contract was a service and the U.C.C. did not apply. Id. The predominant purpose of the contract between Dish Network and Galaxy was a service. Employees from Galaxy were effectively subcontractors who supplied the labor necessary to install satellite television for Dish Network. The summary-judgment evidence in the record is unclear as to whether Galaxy also supplied goods, such as the satellite receiver or other equipment. However, even if Galaxy supplied some goods as part of its agreement with Dish Network, we find no basis in the law to hold anything other than the predominant purpose of the Galaxy satellite installers was to provide the service of installing satellite television. Accordingly, the U.C.C. does not apply to this situation and Jones cannot rely on this general U.C.C. provision to assert the public-policy exception.

**5.      Mail Fraud, 18 U.S.C. § 1341, and Wire Fraud, 18 U.S.C. § 1343**

Jones relies on Beasley, 713 S.W.2d at 559, for the proposition that mail and wire fraud can support a cause of action for wrongful termination under the public-policy exception. Like Missouri's stealing statute, the federal mail and wire fraud statutes are both general criminal statutes. Consequently, Jones must show Galaxy required him to commit a direct violation of the statute to invoke the public-policy exception to at-will employment.

The elements of mail fraud under 18 U.S.C. § 1341 are "(1) a scheme to defraud by means of material false representations or promises, (2) intent to defraud, (3) reasonable foreseeability that the mail would be used, and (4) that the mail was used in furtherance of some

21

essential step in the scheme." United States v. Anderson, 783 F.3d 727, 750 (8th Cir. 2015).

Similarly, wire fraud occurs when a person:

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

18 U.S.C. § 1343. The elements of wire fraud under 18 U.S.C. § 1343 are nearly identical to mail fraud, except for the use of an interstate wire instead of the mail. United States v. McKanry, 628 F.3d 1010, 1017 (8th Cir. 2011). Wire fraud requires proof that the "wire, radio, or television" communication traveled in interstate commerce. 18 U.S.C. § 1343.

We are not convinced that Galaxy required Jones to commit mail or wire fraud. Similar to our rationale with the stealing statute above, Jones's required participation ended with submitting the "good" code in the consumer's paperwork. Jones was not involved in the billing for Dish Network or even saw any of Dish Network's bills. Jones did not devise or intend to devise any scheme to defraud Dish Network; any such scheme was allegedly devised by Galaxy. Nor would Jones have been establishing connectivity to obtain money or property from Dish Network, as any such bonus payment would be sent to Galaxy, not Jones. Thus, Jones has not demonstrated how the mail or wire fraud statutes specifically proscribed the conduct Galaxy required of him.

Additionally, the record lacks any proof regarding essential elements of both mail and wire fraud. The record before us lacks any evidence to suggest that the United States Postal Service or mail was involved in any way in the alleged scheme to defraud Galaxy. Without any evidence that the mail was involved, Jones cannot show that Galaxy required him to directly commit mail fraud. Further, although Galaxy's alleged scheme required the use of a cell phone

22

and a connection to the internet to communicate with Dish Network—which presumably involved radio communication or a wire—the record does not explain how those communications traveled in interstate commerce. The wire fraud statute requires communications to move in interstate commerce. 18 U.S.C. § 1343. Therefore Jones has not demonstrated how Galaxy required him to directly violate either the mail or wire fraud statutes. Because the record does not show that Galaxy required Jones to commit mail or wire fraud, Jones cannot rely on either statute to establish the public-policy exception.

Because the record before us shows that Jones cannot rely on any of his cited statutes to establish the public-policy exception, we need not reach the question of causation. Accordingly, Galaxy has negated an element essential to Jones's claim for wrongful termination. Therefore, Galaxy was entitled to judgment on Count I, and the trial court did not err in granting summary judgment. Point One is denied.

## II.    Point Two—Missouri Human Rights Act (Count II)

When reviewing the grant of summary judgment in an employment-discrimination claim brought under the Missouri Human Rights Act ("MHRA") we must determine if the record shows two plausible, but contradictory, accounts of the essential facts. Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 820 (Mo. banc 2007). The "genuine issue" in the case must be real, not merely argumentative, imaginary, or frivolous. Id.

Under the MHRA, discharging any individual because of such individual's race is an unlawful employment practice. Section 213.055.1(1)(a). An employee alleging racial discrimination need only prove that race was a "contributing factor" in the employer's decision. George v. Civil Serv. Comm'n of St. Louis, 318 S.W.3d 266, 272 (Mo. App. E.D. 2010) (citing Daugherty, 231 S.W.3d at 820). The discrimination need not be a substantial or determining

23

factor in the employment action. Daugherty, 231 S.W.3d at 819. A contributing factor is a condition that "contributes a share in anything or has a part in producing the effect." Lomax v. DaimlerChrysler Corp., 243 S.W.3d 474, 482 (Mo. App. E.D. 2007). Summary judgment should not be granted unless evidence could not support any reasonable inference for the non-movant. Daugherty, 231 S.W.3d at 818.

Jones argues that his race was a contributing factor in his termination for two reasons. First, Jones contends that Galaxy did not terminate Caucasian workers who performed worse than he did, thereby proving that Galaxy's stated reason for Jones's termination (performance) was a pretext for discrimination. Second, Jones maintains that Galaxy treated him differently during his employment because Galaxy gave him less desirable job locations than Caucasian workers. Jones claims that Galaxy gave him jobs in the "very bad parts of town," while Galaxy assigned Caucasian workers to "nicer" areas such as Chesterfield and Creve Coeur.

Jones's claim of pretext with respect to job performance is not supported in the record. First, Jones cannot rely on his unsupported personal opinion or hearsay knowledge that other employees performed worse than he. See Hilfiker v. Gideon Sch. Dist. No. 37, 403 S.W.3d 667, 672 (Mo. App. S.D. 2012) (unsupported personal opinion cannot create a genuine issue of material fact); United Petroleum Serv., Inc. v. Piatchek, 218 S.W.3d 477, 481 (Mo. App. E.D. 2007) ("Hearsay statements cannot be considered in ruling on the propriety of summary judgment."). The only white employee that Jones references to support his claim of discrimination is Rydell, who Jones trained for a short time. Jones has not provided documentation of Rydell's performance evaluations. The record contains no foundation for Jones's allegations that Rydell constantly "messed up." The summary-judgment evidence shows that Jones did not work with or supervise Rydell. Nor did Jones possess personal knowledge of

24

Rydell's alleged poor performance, absent a short time when Jones trained Rydell and when Rydell called Jones for advice on how to do certain tasks.

To the extent Jones's comparative evidence may be based on his personal knowledge, such evidence nevertheless fails to establish the existence of a genuine issue of fact that race was a contributing factor in Jones's termination. In appropriate circumstances, the trier of fact can reasonably infer a discriminatory purpose when an employer provides a false explanation for an employment action. Lomax, 243 S.W.3d at 483. However, even if Galaxy's stated reason for firing Jones was pretext, the evidence in the record clearly demonstrates that not even Jones believes that race was a factor in this termination. Jones was asked at his deposition, "So why do you think you were terminated?" Jones responded, "I feel that if I would have went on board with doing this whole connectivity thing, I still would have been their golden boy ... if I had done the whole connectivity thing, we wouldn't be sitting here right here right now." Jones made no mention or reference whatsoever to race discrimination. Jones testified under oath that he believed Galaxy's explanation for his termination was pretext, and the reason Galaxy terminated him was his unwillingness to establish temporary internet connectivity with the consumer using his cell phone and wi-fi adapter. Jones's own testimony defeats his claim that race was a factor in his termination.

Jones also asserts that Caucasian workers received the better work locations than he to support his claim under the MHRA. *Assuming* Jones's claim of unequal work locations is true, the record is devoid of any further evidence showing some relationship between those events and Jones's termination. Again, as Jones has made clear by his own testimony, taken in the light most favorable to Jones, Galaxy's decision to terminate his employment had absolutely nothing to do with race, but resulted solely from his refusal to establish temporary connectivity. These

25

facts do not support any reasonable inference that race was a contributing factor in Jones's termination.

Because the record does not support a reasonable inference that race was a contributing factor in Jones's termination, Galaxy negated an essential element of Jones's MHRA claim. Therefore, Galaxy was entitled to judgment, and the trial court did not err in granting summary judgment. Point Two is denied.

## III.    Point Three—Section 290.110 (Count VI)

In his third point on appeal, Jones claims the trial court erred in granting Galaxy's motion for summary judgment on Count VI, a violation of Section 290.110 (payment of unpaid wages due to discharged employees). Jones argues that he properly fulfilled every requirement of Section 290.110. Yet, as Jones acknowledges, the Missouri Supreme Court has established a bright-line rule applicable to this case. Under Monterosso v. St. Louis Globe-Democrat Publ'g Co., requests for unpaid wages under Section 290.110 made more than ninety days after termination are untimely as a matter of law. 368 S.W.2d 481, 489 (Mo. banc 1963).

Jones acknowledges his request was untimely under Monterosso, but maintains the Supreme Court's decision was in error. Jones asserts that the Supreme Court improperly read a ninety-day requirement into the statute, when the text of Section 290.110 does not include a time limit. This Court cannot overrule the Missouri Supreme Court. See Mo. Const. art. V, § 2; Doe v. Roman Catholic Archdiocese of St. Louis, 311 S.W.3d 818, 822 (Mo. App. E.D. 2010) (we are "constitutionally bound to follow the most recent controlling decision of the Missouri Supreme Court"). Alternatively, Jones moves that we transfer this matter to the Missouri Supreme Court because of the general interest or importance of the question. We decline to do so. Point Three is denied.

26

## Conclusion

The trial court's summary judgment order is affirmed.

_Kurt S. Odenwald_
KURT S. ODENWALD, Judge

Sherri B. Sullivan, P.J., concurs.
Patricia L. Cohen, J., concurs.